## BROWNING v. DE FORD.

ERROR TO AND APPEAL FROM THE SUPREME COURT OF THE TERRI-
TORY OF OKLAHOMA.

No. 245.  Argued April 16, 17, 1900. —Decided May 21, 1900.

General creditors attaching the goods of an insolvent debtor upon the
ground that they had been purchased under fraudulent representations,
when sued by chattel mortgagees of said debtor, may attack the mort-
gage by showing that the mortgagees knew that the goods had been
fraudulently purchased.

THIS was an action in the nature of trover by the surviving
partners of the firm of Henry W. King & Company, and four
other creditors, as chattel mortgagees, against Charles H.
De Ford, sheriff of Oklahoma County, to recover the value of
a stock of goods seized by the defendant and sold under writs
of attachment issued against the property of the firm of W. F.
Wolfe & Son, in suits instituted by general creditors of that firm.

Defendant justified under these writs of attachment, and
alleged that the indebtedness of each of the attaching plain-
tiffs was procured by W. F. Wolfe & Son by means of false
and fraudulent representations as to their financial standing
and credit; that the mortgage was executed by such firm in
pursuance of a conspiracy between the firm and the mortgage
creditors, who had knowledge of the fraudulent acts of the
firm, and knew that the mortgage was given with intent to
hinder, delay and defraud their general creditors; that the
mortgage was neither given nor accepted in good faith for
the purpose of securing a *bona fide* indebtedness; but that the
indebtedness was in part, if not wholly, false, fictitious and
trumped up to suit the occasion, and that the real intent of
Wolfe & Son in executing the mortgage was to place their
property beyond the reach of their creditors.

The case was tried before a jury, and resulted in a verdict
and judgment for the defendant, which was affirmed by the

Supreme Court of the Territory (*Browning* v. *De Ford*, 8 Oklahoma, 239); whereupon plaintiffs brought the case to this court both by writ of error and appeal. Another suit in attachment brought by E. S. Jaffray & Co. against Wolfe & Son, in which the mortgage was set up as a defence and the facts were the same, also resulted in a judgment that the mortgage was fraudulent. *Jaffray* v. *Wolfe*, 4 Oklahoma, 303.

*Mr. John W. Shartel* for plaintiffs in error and appellants.

*Mr. Arthur A. Birney* for defendant in error and appellee.

MR. JUSTICE BROWN, after making the above statement, delivered the opinion of the court.

This was a contest between mortgage creditors suing as plaintiffs and attaching creditors representing the defendant sheriff.

The facts are that on December 15, 1890, the firm of W. F. Wolfe & Son, retail merchants, and conducting a store at Oklahoma City, executed a joint chattel mortgage to one Vance and several other creditors for whom he acted, and by whom he was authorized to take any security he could get, of their stock of goods at Oklahoma City, and another stock at the city of Guthrie, not involved in this case. The mortgagees immediately took possession of the mortgaged property by one Harvey, their agent, and a brother-in-law of Vance, who proceeded to take an inventory. Shortly after the execution of the mortgage, a number of other creditors brought suits in attachment against Wolfe & Son, and through the defendant De Ford, sheriff of Oklahoma County, levied upon the goods, and dispossessed the mortgagees, who brought suits for the conversion of the property. These suits were subsequently consolidated into two cases, in one of which all the mortgage creditors appear as plaintiffs, and the sheriff of Oklahoma County as defendant. The defence was that the goods were fraudulently obtained of the attaching creditors by false representations made by W. F. Wolfe & Son as to their assets, and that

Vance, one of the mortgage creditors, acting for himself and as agent and attorney for the others, not only had full knowledge that such goods were wrongfully and fraudulently obtained, but actively participated in obtaining the same, and that he had full knowledge that the mortgage was executed by Wolfe & Son for the purpose of hindering, delaying and defrauding their creditors, and actively participated in such fraudulent device. In other words, in brief, that the goods were purchased in the pursuance of a conspiracy that when a large stock had been obtained by Wolfe & Son by means of fraudulent statements as to their assets, certain deeds of their real estate which had been previously made, but which had remained unrecorded, should be placed of record, and the goods and merchandise obtained upon such fraudulent statements should be mortgaged to the plaintiffs in satisfaction of their claims.

In this connection the court charged the jury that, "in order to invalidate the chattel mortgage, it is not enough for the defendant to show simply that the firm of W. F. Wolfe & Son fraudulently purchased goods of the attaching creditors, but it must also appear from the evidence that the plaintiffs in this case were parties to such fraud; that they were either active participants in such fraud, or that they aided or abetted in such fraud, or that such plaintiffs at the time they took such mortgage actually knew that Wolfe & Son had fraudulently incurred a liability and debt for the goods or a portion thereof described in the chattel mortgage."

Though there are many assignments of error, there are really but two which require our consideration: First, that there was no evidence of knowledge on the part of Vance, who acted for the mortgage creditors, of the fraudulent character of the purchases made by Wolfe & Son of the attaching creditors; second, that the court erred in holding the mortgagees liable simply upon proof that the mortgage was taken with knowledge of such fraudulent representations.

1. To make out their case the attaching creditors were bound to show, first, that the goods were fraudulently purchased, and, second, that the mortgagees, or Vance, their agent, was a party to or cognizant of such frauds. There was ample evidence that

the goods were fraudulently purchased. The firm of **W. F.**
**Wolfe & Son** was composed of William F. Wolfe, the father,
and Louis H. Wolfe, the son. On January 5, 1887, Louis H.
Wolfe deeded to his wife Winifred, in consideration of love and
affection, a certain lot of land, No. 15, in Topeka, Kansas, by
deed, which was not recorded until December 17, 1890. On
July 26, 1890, William F. Wolfe and his wife Georgia H. deeded
to Laura V. Vance, their daughter, and the wife of A. H. Vance,
another lot in the city of Topeka, No. 20, in consideration of
the sum of $6500, and subject to a mortgage of $4000. This
deed was also filed for record December 17, 1890. On Septem-
ber 8, Georgia H. Wolfe, wife of William F. Wolfe, made ap-
plication to the townsite trustees of Oklahoma City for a deed
to four lots of land in that city, being the site of their business
house, stating that she had purchased the same on May 17, 1890,
of Louis H. Wolfe, her son, and William F. Wolfe, her hus-
band, who had given her a quitclaim deed to the same. This
deed was also recorded the same day (December 17). Notwith-
standing these deeds, the Wolfes, in their statement of assets
furnished the attaching creditors, included all this real estate,
putting an estimate of $20,000 upon that in Topeka and $12,000
upon that in Oklahoma. This amount added to the value of
the Oklahoma store stock $17,000 and the Guthrie store stock
$35,000, made their total assets $84,000, less $27,000 liabilities,
net assets $57,000. Sundry letters were produced from the
firm, written during the summer and fall of 1890 to several of
the attaching creditors, in which this real estate was included
as a part of their assets, notwithstanding that most of it had
already been conveyed to different members of their families.
These facts, which were not denied, and which were scarcely
susceptible of denial, were fully established, and were clearly
sufficient to lay before the jury as to the fraudulent character
of the purchases of the attaching creditors.

The facts that Vance was a lawyer of long standing and con-
siderable practice, and, as already stated, was the son-in-law of
William F. Wolfe; that one of the deeds was to his wife, and
was withheld from record for several months, and until a day
or two after the chattel mortgage was made; that he could

scarcely have failed to know that other deeds had been made to the wives of William F. and Louis H. Wolfe, which were also withheld from record; that these men were merchants who were constantly buying and replenishing their stock and stood in need of credit; and that he was himself one of the creditors secured by the mortgage—for a debt, too, which had been already partially paid—were, we think, sufficient evidence to open to the jury the question of his connection with the scheme of Wolfe & Son to execute this mortgage for the purpose of defrauding their unsecured creditors. The very fact that one of these deeds was withheld from record for three years and a half, another for eight months and another for about six months was, unexplained, sufficient to indicate that they were withheld for no good purpose. While evidence was lacking of a direct participation by Vance in these plans to defraud the creditors of Wolfe & Son, his intimate connection with the family and the fact that the mortgage was given, partially at least, to secure him for his liability as surety for the firm, was not too remote to justify the court in laying the whole matter of his connection with the fraudulent scheme before the jury, and as he was acting as agent and attorney for the other secured creditors, they were equally chargeable with himself.

2. Upon the second point, the jury were instructed in substance that to defeat the mortgage it was necessary for the attaching creditors to show that Wolfe & Son were guilty of fraud in contracting the debts, to satisfy which the writs of attachment were levied; and also to show that the mortgagees were parties to such fraud; or that at the time they took the mortgage they knew that Wolfe & Son had fraudulently incurred a liability for the goods described in the mortgage. The objection of the plaintiffs to this instruction is stated in their fourth assignment of error, that the court " erred in holding as a principle of law that where goods have been fraudulently obtained by means of false representations as to the financial standing of a debtor, and where such creditors elect to sue for the purchase price of such goods, and proceed by the attachment of the property claimed to belong to the debtor, that a party previously taking a mortgage on such goods to secure an

antecedent debt, with knowledge of such false representations, must surrender such property to such attachment creditors."

The theory of the plaintiff is that the attaching creditors had an election of remedies — either to rescind the sale and replevy the goods, in which case it would have been sufficient as against the mortgagees to prove that they took the mortgage with the knowledge that the goods had been fraudulently purchased, and that the mortgagors had no title to them; or to sue for the purchase money and thereby affirm the sale, and to attach the goods as the property of the mortgagors, in which case the mortgagees would stand only as preferred creditors, and their mortgage would be valid, notwithstanding their knowledge that the goods had been fraudulently purchased.

It is entirely true that, upon being satisfied that the goods had been purchased upon fraudulent representations, the attaching creditors had an election of remedies. They might rescind the sale and replevy the goods, or they might affirm the sale, sue for the purchase price, and attach the goods upon the ground that they had been fraudulently purchased. Had it not been for the mortgage, it would only have been necessary for the attaching creditors to show that the debts were fraudulently contracted, to sustain their attachment; but in order to attack the mortgage, and to show that they had a title superior to that of the mortgage creditors, it was necessary to go further, and prove that the mortgage was fraudulent. This might be done by evidence that the mortgage was taken in pursuance of a scheme to defraud the general creditors, or that the mortgagees took their security with the knowledge that it covered goods which had been purchased upon fraudulent representations, and that the purchases were made under such circumstances as would entitle the vendors to rescind the sale and reclaim the goods. They chose, it is true, to treat the sale as valid, sue for the purchase price, and thereby affirm the title of the vendees, but they did not thereby affirm the mortgage. Their approbation went no farther than the sale from themselves to Wolfe & Son. Their reprobation went to the mortgage, and to that alone. There was, indeed, an election of remedies, and having made an election the attaching creditors

were bound thereby. But such election went no farther than to affirm the sale, under which they were at liberty to attach the goods as still belonging to the vendees. They were bound no farther by the fraudulent mortgage of such goods than they would have been by the fraudulent assignment of them, and no class of cases is more common than that of attachments sued out for goods which are claimed to have been fraudulently assigned.

The instruction complained of is fully supported by the recent case in the Supreme Court of Kansas of *Wafer* v. *Harvey County Bank*, 46 Kansas, 597, which holds directly that an antecedent creditor, who knows that his debtor procured goods and merchandise by fraudulent means, cannot by a chattel mortgage secure a lien upon such fraudulently procured goods, adverse to the innocent vendors of such goods. This was also an action by a chattel mortgagee against the sheriff who had seized under attachments a stock of goods belonging to the attachment debtor. The distinction relied upon by the plaintiffs in this case was noticed in that, the court remarking that these goods having been obtained from the attaching creditors by fraudulent means, the debtor acquired no title to them, and the attaching creditors would be justified in retaking the goods, or they could waive the tort and bring an action for their value, in which case knowledge of the plaintiffs that the goods had been fraudulently obtained, did not put them in a position of *bona fide* purchasers or enable them to set up the mortgage against attaching creditors.

In the cases relied upon by the plaintiff, but one (*Stokes* v. *Burns*, 132 Mo. 214) is in point. In that case it was held that where defendants procured goods by fraud, and transferred the same in trust for a bank, to secure a *bona fide* indebtedness, the mere knowledge of the bank that the goods were so procured, and that the defendants intended to defraud their other creditors, is not sufficient to avoid the trust deed at the suit of a creditor, who did not seek to disaffirm the sale of property by him to defendants. The suit was by attachment for the recovery of an amount for flour sold by plaintiff to the defendants, under which the sheriff seized certain property. The grantee

under the deed of trust filed an interplea, claiming the property so seized under his deed. The court held that the plaintiff, by suing upon his account, waived the fraud in the sale, and treated it thereby as the property of the defendants, with the same power of disposition in the defendants over it as of any other property owned by them. It was said: "If the debts secured by the deed of trust were honest debts, and the property conveyed was not excessive, and no collusive agreement shown between the defendants and the bank and Ayr Lawn Company or the trustee in the deed of trust for the use of the defendants, the deed of trust must be maintained, and there was nothing to submit to the jury. No proof was offered or claim made at the trial that any part of the property conveyed by the deed of trust was, by agreement between defendants and the beneficiaries, to be held for the use of defendants. Then proof of fraud on the part of defendants in procuring the property would have no tendency to prove such a result. If the debt secured was honest, the dishonest methods of defendants in gathering to themselves the property, and the knowledge of that fact by the beneficiaries, together with a knowledge of defendant's intention to defraud their other creditors in making the deed, all would not invalidate the deed or make availing to plaintiff the property thus conveyed in this character of suit." It was admitted in the case that the plaintiff had an election of remedies, but it was said that "the action of the plaintiff in that case was based upon a contract of sale, and was a confirmation of it and a waiver of all fraud involved in it, so far as the rights of the interpleader are concerned in the contest for the property. The sole inquiry, then, was as to the alleged fraudulent disposition of the property by the deed of trust to the interpleader, with the burden of its establishment upon the plaintiff."

We are unable to accept this view of the law. We think it makes no difference as to the rights of the mortgagee whether the action be in replevin or assumpsit. In either case the mortgagee can hold them if he be a *bona fide* purchaser, without notice, but not otherwise. If the attaching creditors rescind the sale and sue in replevin, the mortgagees, having knowledge of

the fraudulent purchase, are in the position of taking a mort-
gage upon property to which they knew the mortgagor had
no title. If, upon the other hand, the creditors proceed by
attachment, the mortgagees, knowing that the goods were
fraudulently purchased, stand in the position of taking advan-
tage themselves of the debtor's fraud and obtaining a prefer-
ence to which they are not justly entitled. If, as the evidence
had some tendency to show, they actively participated in the
fraud, their position is even worse.

It is consonant neither with good morals nor sound sense to
hold that one may take a mortgage upon the property of an-
other, which he knows to have been fraudulently acquired, and
to which the purchaser has no valid title, whether the vendor
elect to pursue the purchaser by a retaking of the property, or
by an action for the price and an attachment of the property
to secure the debt. Whichever remedy be pursued, the fact
remains that, at the time the mortgage was taken, the mort-
gagor had a voidable title to the property mortgaged; and
while an election to sue in assumpsit recognizes this title as be-
tween him and the vendor, such recognition does not redound
to the validity of the mortgage, which must be judged of by
the circumstances under which it was taken. In other words,
the suit in assumpsit affirms the title of the vendee but not the
title of his mortgagee.

It is at least open to doubt whether, if the mortgagees had
disposed of these goods, an action might not have lain against
them for their value, upon the same principle that supports an
action, where the seller is induced by fraudulent representations
to sell goods to an insolvent third person, from whom the mis-
representing third person afterwards obtains them. An action
lies on the assumption either of a fraudulent conspiracy ren-
dering such participant liable, or upon the ground that the
nominal purchaser was only a secret agent for the misrepre-
senting party, who finally bought the goods. *Biddle* v. *Levy*,
1 Stark. 20; *Hill* v. *Perrott*, 3 Taunt. 274; *Phelan* v. *Crosby*,
2 Gill. 462; *State* v. *Schulein*, 45 Missouri, 521; 2 Schouler's
Pers. Prop. sec. 612; Benj. on Sales, 4th ed. sec. 445.

The other cases cited by the plaintiffs are not in point. In

*O'Donald* v. *Constant*, 82 Indiana, 212, the evidence showed that the debtor who purchased the goods fraudulently turned them over to certain preferred creditors who had no knowledge of the fraudulent purchases. The case of *Bach* v. *Tuch*, 126 N. Y. 53, merely holds that a suit for the price brought with knowledge of the fraud was a ratification of the sale, and estopped the vendor from rescinding it and suing in replevin. The cases of the *First National Bank* v. *McKinney*, 47 Nebraska, 149, and *Thomason* v. *Lewis*, 103 Alabama, 426, are to the same effect.

Upon the whole, we see no error in the judgment of the Supreme Court, and it is therefore

*Affirmed.*