37 App.D.C. 266

## UNITED STATES ex rel. HUMBOLDT STEAMSHIP COMPANY v. INTERSTATE COMMERCE COMMISSION.

No. 2276.

Court of Appeals of the District of Columbia.

Submitted April 7, 1911.   Decided May 24, 1911.

Messrs. Blair, Drayton & Hillyer and Mr. John B. Daish, for the appellant.

Mr. P. J. Farrell for the appellee.

Mr. F. C. Elliott appeared as amicus curiæ.

Mr. Justice Van Orsdel delivered the opinion of the Court:

Three propositions are presented by the appeal: First, has the Interstate Commerce Commission jurisdiction to consider the case in question; second, has the supreme court of the District of Columbia jurisdiction to compel the Commission, by writ of mandamus, to consider a case in which it has refused to proceed on the ground of want of jurisdiction; and, if so, third, can the Commission be compelled to assume jurisdiction of the present case?

The Commission refused to take jurisdiction of the case presented by the petition of the relator company for the reason, as set forth in the majority opinion, that Alaska is not a territory of the United States within the meaning of the interstate commerce act. By the act of Congress of June 29, 1906 (34 Stat. at L. 584, chap. 3591), the provisions of the interstate commerce act were extended to apply "to any common carrier or carriers engaged in the transportation of passengers  *  *  *  wholly by railroad (or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment), from one state or territory of the United States, or the District of Columbia, to any other State or territory of the United States, or the District of Columbia, or from one place in a territory to another place in the same territory, or from any place in the United States to an adjacent foreign coun-

try, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country, and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States, and carried to such place from a port of entry either in the United States or an adjacent foreign country."

By the same act it was provided that "the Commission may also, after hearing on a complaint, establish through routes and joint rates as the maximum to be charged, and prescribe the division of such rates as hereinbefore provided, and the terms and conditions under which such through routes shall be operated, when that may be necessary to give effect to any provision of this act, and the carriers complained of have refused or neglected to voluntarily establish such through routes and joint rates, provided no reasonable or satisfactory through route exists, and this provision shall apply when one of the connecting carriers is a water line."

This act is the expression of a comprehensive design on the part of Congress to generally regulate interstate and territorial commerce throughout the entire territory incorporated within the limits of the United States. The power conferred upon Congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes" (Const. art. I, sec. 8, cl. 3) is unlimited within its domain. "This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23. Congress has power to delegate to an administrative body, as exemplified in the Interstate Commerce Commission, authority to establish general regulations for the control of common carriers engaged in such commerce, and to impose upon the courts power to enforce such regulations. This general power, exercised in the manner suggested, will be interpreted to extend to all sections of the country that can be embraced reasonably within its provisions. If, by liberal and proper construction of the act, Alaska can be held to be included within

its provisions, we deem it to be our duty to so rule. Chicago, M. & St. P. R. Co. v. Voelker, 65 C.C.A. 226, 129 F. 522, 70 L.R.A. 264.

Both in the majority opinion of the Commission and in the argument at bar, much stress was laid upon the term "organized territory." In fact, the case, in the opinion of the Commission and of counsel, seems to turn upon whether or not Alaska is an organized territory of the United States. We are not impressed with this distinction. The power of Congress to deal with territories under article 4, sec. 3, of the Constitution, is so general and unlimited that the character of government afforded the people of a territory is wholly immaterial so long as its inhabitants are protected in their constitutional rights. In the case of Rassmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862, it was argued that Alaska was not an organized territory of the United States, because Congress, in extending the Constitution to what it designated as the organized territories (Rev.Stat. sec. 1891), did not include Alaska. The court, deciding the question there involved on the ground that Alaska is a territory incorporated into the United States by the terms of the treaty of cession from Russia, dismissed the contention by holding that the acts of Congress extending the Constitution to the incorporated territories therein named were "declaratory merely of a result which existed independently by the inherent operation of the Constitution." The particular manner in which a territory has been organized by Congress is of little importance, but the question of its incorporation as a part of the United States is all-important in determining its status as a territory of the United States.

A sharp distinction has been made in Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088, and later affirmed in Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128, 1 Ann.Cas. 697, between territory which, either by the terms of the treaty by which it was acquired, or by express act of Congress, has been incorporated into the United States, and territory that has not been so incorporated. In the Dorr Case this distinction is summed up as follows; "Until Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled by that decision [Downes v. Bidwell] that

the territory is to be governed under the power existing in Congress to make laws for such territories, and subject to such constitutional restrictions upon the powers of that body as are applicable to the situation. * * * If the treaty-making power could incorporate territory into the United States without congressional action it is apparent that the treaty with Spain, ceding the Philippines to the United States, carefully refrained from so doing; for it is expressly provided that (article 9) 'the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.' In this language it is clear that it was the intention of the framers of the treaty to reserve to Congress, so far as it could be constitutionally done, a free hand in dealing with these newly-acquired possessions."

In Downes v. Bidwell, supra (182 U.S. p. 335, 21 S.Ct. 770, 45 L.Ed. 1088), Mr. Justice White, in a concurring opinion, referring to the status of Alaska as compared with the Philippines, said: "Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that that treaty also contained provisions for incorporation, and was acted upon exactly in accord with the practical construction applied in the case of the acquisitions from Mexico, as just stated." And in the same case, Mr. Justice Gray, in his concurring opinion, said: "The cases now before the court do not touch the authority of the United States over the territories, in the strict and technical sense, being those which lie within the United States, as bounded by the Atlantic and Pacific oceans, the Dominion of Canada and the Republic of Mexico, and the territories of Alaska and Hawaii; but they relate to territory, in the broader sense, acquired by the United States by war with a foreign State."

In the case of the Coquitlam v. United States, 163 U.S. 346, 16 S.Ct. 1117, 41 L.Ed. 184, a suit in admiralty was brought in the district court of Alaska to enforce a forfeiture for violating the revenue laws of the United States. The jurisdiction of the circuit court of appeals of the ninth circuit was challenged on the ground that the Alaska court was not a district court within the meaning of the judiciary act of 1891. On this point the court said: "Alaska is one of the territories of the United States. It was so

designated in that order [referring to the order of the Supreme Court assigning Alaska to the ninth circuit], and has always been so regarded. And the court established by the act of 1884 is the court of last resort within the limits of that territory. It is, therefore, in every substantial sense, the supreme court of that territory."

In Rassmussen v. United States, supra, the court, considering whether or not the right of trial by jury, as guaranteed by the 6th Amendment to the Constitution, extended to Alaska, clearly defined the legal and political status of that territory, as follows: "It follows, then, from the text of the treaty by which Alaska was acquired, from the action of Congress thereunder, and the reiterated decisions of this court, that the proposition that Alaska is not incorporated into and a part of the United States is devoid of merit, and therefore the doctrine settled as to unincorporated territory is inapposite, and lends no support to the contention that Congress, in legislating for Alaska, had authority to violate the express commands of the 6th Amendment."

It follows, therefore, that a subdivision of the territory of the United States that has been incorporated into the United States, as Alaska has been, and provided by Congress with a civil government, is a territory of the United States. In the principal acts of Congress relative to the establishment of civil government in Alaska (Act of May 17, 1884, 1 U.S.Rev.Stat.Supp. p. 430, 23 Stat. at L. 24, chap. 53; act of June 6, 1900, 31 Stat. at L. 321, chap. 786), together with numerous other acts relating to Alaska (Rev.Stat. secs. 1954–1957; 27 Stat. at L. 955; 29 Stat. at L. 267, chap. 373; 30 Stat. at L. 409, 1253, chaps. 299, 429; 31 Stat. at L. 321, chap. 786; 33 Stat. at L. 616, 1265, chaps. 277, 1497; 34 Stat. at L. 169, 963, chaps. 2083, 1635), it is referred to both as a territory and as a District; but this we deem unimportant. The government of Alaska today is as complete in its operation and in its legal and constitutional bearings as any that has ever been provided for a territory. It is no less a territory of the United States because Congress, instead of providing it with a local legislature, supplies that necessity itself. In First Nat. Bank v. Yankton County, 101 U.S. 129, 25 L. Ed. 1046, the court, defining the power of Congress to leg-

islate for the territories, said: "The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States; and Congress may legislate for them as a State does for its municipal organizations. * * * Congress may not only abrogate laws of the territorial legislatures, but it may itself legislate directly for the local government. * * * In other words it has full and complete legislative authority over the people of the territories and all the departments of the territorial governments. It may do for the territories what the people, under the Constitution of the United States, may do for the States."

Congress, in the government of the territories, has plenary power, except as limited by the Constitution. The particular form of government it shall establish is not prescribed. It has, for example, prescribed one form of government for New Mexico, another for the District of Columbia, and still another for Alaska. In New Mexico, as in most of the territories that have in the past been created and organized by Congress, a government resembling in many respects that of the States has been established, with executive and judicial officers and a local legislature elected by the people of the territory. While Congress, in the government of the District of Columbia, is limited by provisions of the Constitution not applicable to other territory of the United States, the same power exists of establishing local government. The mere fact that a legislature elected by the people of the District of Columbia has not been provided—Congress reserving to itself, as in Alaska, that function—does not operate to deprive the District of Columbia of an organized form of civil government. It follows that since Congress may legislate directly in respect of the local affairs of a territory, Alaska, which has been provided with executive and judicial officers and a civil and penal code, has a complete system of civil government, and is an organized territory of the United States. Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 48 L.Ed. 1087.

The interstate commerce act is remedial legislation for the regulation of common carriers engaged in commerce in all parts of the United States, where such regulation, in the mind of Congress, is necessary. The act uses the unquali-

fied term "territories of the United States," which can only refer to what are known as the territories incorporated into and belonging to the United States, in which civil government has been established and in which the operation of the commerce act would be beneficial. Every reason exists for the inclusion of Alaska. There is much traffic between its shores and the ports of the Pacific seaboard. Railroads are being built and projected into the interior of Alaska to accommodate the growing commerce due to the rapid development of the country. Every argument, therefore, favors the intent of Congress by its latest act to include this territory within the jurisdiction of the interstate Commerce Commission.

The common-law jurisdiction of the supreme court of the District of Columbia, sitting as a circuit court, to issue a writ of mandamus against an officer of the government in a proper case, will be conceded. It likewise follows that similar power is vested in the court to command the performance of a duty purely legal, and in which no act of judgment or discretion is involved by an official board or commission of the government. This power has been so long and so frequently exercised as to admit of no doubt of the existence of the authority. Kendall v. United States, 12 Pet. 524, 9 L.Ed. 1181; Decatur v. Paulding, 14 Pet. 497, 10 L.Ed. 559; United States v. Schurz, 102 U.S. 379, 26 L.Ed. 167; Garfield v. United States, 211 U.S. 249, 29 S.Ct. 62, 53 L.Ed. 168; United States ex rel. Parish v. Mac Veagh, 214 U.S. 124, 29 S.Ct. 556, 53 L.Ed. 936.

This brings us to consider whether this case is one calling for the exercise of jurisdiction by mandamus. Blackstone, in his Commentaries, vol. 3, 110, defines the writ of mandamus to be "a command issuing in the King's name from the court of King's bench, and directed to any person, corporation, or inferior court of judicature within the King's dominions, requiring them to do some *particular* thing therein specified, which appertains to their office and duty, and which the court of King's bench has previously determined, or at least supposes, to be consonant to right and justice." Before this extraordinary process will issue it must appear that the Interstate Commerce Commission is an official body to whom, on legal principles, the writ may be directed. It also must appear that the relator is

without any other legal remedy. Referring to the latter point, when relator's complaint was dismissed for lack of jurisdiction by the Commission, it applied for a rehearing, as provided in the interstate commerce act. When that application was denied, relator had no specific remedy, either in law or equity, except by mandamus.

We must now inquire into the official status of the Commission against whom we are asked to direct the issuance of this writ. While the powers conferred upon the Commission are exceedingly broad and of the utmost importance, they are only such as Congress in its legislative capacity possesses. It has power to require that transportation charges for passengers and property must be just and reasonable; that freight shall be properly and reasonably classified; that rebates and discriminations, undue and unreasonable preferences, pooling of freight and division of earnings, shall not exist. It has power to regulate the long and short haul; to require the posting and filing of schedules of rates, the publication of rates, and the regulation of joint tariffs between companies owning or operating connecting lines; to require railroad companies to construct and maintain switches and connections with lateral or connecting lines of roads; to establish through routes and just and reasonable rates applicable thereto; and, in fact, to conduct hearings and make orders generally regulating commerce within the express limitations of the commerce act.

Severe penalties are prescribed for the violation of the duties and obligations imposed by the act and for the failure of a carrier to comply with the orders of the Commission. But the act specifically provides that any violation of its penal provisions "shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted." 32 Stat. at. L. 847, chap. 708 (49 U.S.C.A. § 41 and note); 36 Stat. at L. 547 (49 U.S.C.A. § 1). In respect of the enforcement of the orders of the Commission, it is provided that "if any carrier fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or

the United States by its Attorney General, may apply to the commerce court for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it or them obedience to the same." 36 Stat. at L. 555 (49·U.S.C.A. § 16 and note).

Thus it will be observed that by the provisions of the last general act of Congress conferring power and jurisdiction upon the Interstate Commerce Commission, the commerce court was created. Cases from the Commission do not reach that court by the usual avenue of appeal, but by original proceedings to enforce or restrain the orders of the Commission. A careful review of the acts conferring jurisdiction upon the Commission fail to disclose the bestowal by Congress upon it of any of those powers to enter judgments and decrees belonging to courts of general jurisdiction. Its acts are administrative, and not judicial. Like all executive and administrative officers and boards of the government, it possesses quasi judicial functions which require the exercise of judgment and discretion in deciding questions of fact and applying the law thereto as defined in the statutes. But it takes more than this to make a court of general or special jurisdiction. The power that resides in courts to enter final judgments and decrees and to enforce them is wanting in this Commission. Its duty is confined to administering powers conferred in Congress by the commerce clause of the Constitution, and delegated, under proper limitations, to the Commission to administer.

It is insisted that the Commission, in arriving at a decision that it was without jurisdiction to consider relator's complaint, exercised judicial discretion, and that mandamus will not lie to compel it to take jurisdiction. After the petition was filed by relator, evidence was taken and a hearing had at which arguments were made. It was upon consideration of the case so presented that a decision was reached by the Commission that it was without jurisdiction in the premises. It is elementary law that a writ of manda-

mus will issue to require an inferior court to assume jurisdiction of and decide a matter within its jurisdiction, and pending before it for judicial determination, but the writ will not issue to control its decision. Ex parte Flippin, 94 U.S. 348, 24 L.Ed. 194; Ex parte Denver & R. G. R. Co. 101 U.S. 711, 25 L.Ed. 872; Ex parte Burtius, 103 U.S. 238, 26 L.Ed. 392; Ex parte Morgan, 114 U.S. 174, 5 S.Ct. 825, 29 L.Ed. 135.

It is well settled that where the question of jurisdiction is a peremptory one enjoined by law, it matters not that the officer, board, or tribunal may have granted a hearing before deciding that issue. If jurisdiction depended upon the ascertainment or determination of some preliminary fact or facts, the case would be different. It would not in that instance be solely a question of law, and mandamus would not lie to direct the action that should be taken in deciding the preliminary issues of fact. In determining whether or not an officer, tribunal, commission, or board has jurisdiction to act in a given case, there can be no such thing as preliminary or temporary assumption of jurisdiction where no jurisdictional facts are involved. When jurisdiction is expressly imposed by law, no amount of preliminary inquiry to determine that question can deprive the party injured by an erroneous ruling thereon of his right to have such ruling corrected, and, in the absence of any other legal remedy, he is entitled to the relief afforded by mandamus.

In the case at bar the power of determining in what particular territory the Commission shall exercise jurisdiction is not left to its discretion. No question of fact is involved in its determination. Its jurisdiction in that respect is defined by the positive declaration of the law-making power. It is purely a question of law, and not one of fact, or of mixed law and fact. No exercise of discretion by the Commission in its administrative capacity is involved in passing upon the extent of its territorial jurisdiction under the act of Congress. It matters not, therefore, the extent of the hearing indulged by the Commission in this case before it arrived at the conclusion that it was without jurisdiction. The law is mandatory upon it to take jurisdiction within the territorial limits defined in the act. It is the power of the Commission to act that is before us, and not the expedien-

cy or manner in which it shall act under the jurisdiction imposed. It logically follows from the contention of counsel for the Commission that, if its decision that it is without jurisdiction in Alaska is not reviewable by the courts, it is within its power to declare itself without jurisdiction in Ohio, and such a decision would be for the same reason beyond correction by the courts. The same reasoning ultimately leads to the conclusion that it is within the power of the Commission to entirely devest itself of jurisdiction, and thereby nullify the will of Congress.

We are therefore of opinion that Alaska is a territory of the United States embraced within the provisions of the act of Congress to regulate commerce, and that the Interstate Commerce Commission has jurisdiction of the matters and things presented in relator's complaint. The judgment is reversed with costs, and the cause is remanded with directions to issue a peremptory writ of mandamus directed to the Interstate Commerce Commission, requiring it to take jurisdiction of said cause and proceed therein as by law required. Reversed.

An application by the appellee for a writ of error to the Supreme Court of the United States was made by the appellee, and was pending, unacted upon, at the time this report went to press.