UNITED STATES SUGAR EQUALIZATION BOARD, Inc., v. P. DE RONDE & CO. Inc.*

(Circuit Court of Appeals, Third Circuit. August 10, 1925.)

No. 3195.

1. United States ⟷93—"Debts" of United States, which Congress has power to pay, include claims resting only on equitable or honorable obligation.

Under Const. art. 1, § 8, providing that Congress has power to pay debts of United States, "debts" include claims resting on merely equitable or honorable obligation, and not recoverable at law against an individual.

[Ed. Note—For other definitions, see Words and Phrases, First and Second Series, Debt.]

2. Constitutional law ⟷60—Determination that claim against Sugar Equalization Board was moral obligation of government belonged exclusively to Congress.

Determination that claim of importer of sugar at direction of United States Sugar Equalization Board constituted moral obligation was exercise of legislative power, belonging exclusively to Congress, which it could not delegate.

3. Constitutional law ⟷60—Congress may invest some person with power to determine existence of conditions precedent to execution of law and to execute it.

Congress may enact a law and prescribe certain conditions under which and when it may be executed, and at the same time invest some person with power to determine existence of conditions and to execute the law.

4. Constitutional law ⟷60—Congress may not give to any one discretion to nullify its laws.

Congress may not give to any one absolute discretion to ignore or nullify, without conditions, a law which it has enacted.

5. United States ⟷116—Resolution by which President was "authorized" to pay claim held mandatory.

Resolution of Congress by which President was "authorized" to require United States Sugar Equalization Board, Inc., to pay loss to importer of sugar for which government was morally responsible, held mandatory; "authorized" meaning "directed."

[Ed. Note—For other definitions, see Words and Phrases, First and Second Series, Authority—Authorize.]

6. Assignments ⟷48—Resolution by which President was authorized to pay claim to sugar importer held equitable assignment.

In view of Act March 4, 1915, where, on liquidation of United States Sugar Equalization Board, money in its treasury would belong to United States and was subject to equitable assignment, resolution of Congress, authorizing President to require board to pay claim to sugar importer, held to be equitable assignment of money in treasury of board to extent of importer's loss.

**7. Injunction ⟨⟩74—When performance of duty will be made impossible by threatened official act, party to be injured may have injunction to prevent act.**

When a plain official duty, not requiring exercise of discretion, is to be performed, and performance will be made impossible by threatened official act, for which adequate compensation cannot be had at law, party who will be injured thereby may have injunction to prevent such act.

Buffington, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Bill by P. De Ronde & Co., Inc., against the United States Sugar Equalization Board, Inc. From a decree granting a preliminary injunction (299 F. 659) defendant appeals. Affirmed.

William A. Glasgow, Jr., of Philadelphia, Pa., Edwin P. Shattuck, of New York City, and Charles F. Curley, of Wilmington, Del., for appellant.

Robert H. Richards, of Wilmington, Del., and Joseph M. Hartfield, Jeremiah M. Evarts, and White & Case, all of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from a decree of the District Court restraining the United States Sugar Equalization Board, Inc., hereinafter called the board, from disposing of its property, distributing its assets, and dividing its capital stock, until it has ascertained and paid to P. De Ronde & Co., Inc., hereinafter called plaintiff, the money representing the loss it sustained in a certain sugar transaction which it entered into and carried on "at the request and under the direction of the Department of Justice."

During the first half of 1920, sugar was selling throughout the United States in excess of 26 cents per pound retail. Under the Food Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), as amended by Act Oct. 22, 1919, §§ 1, 2 (Comp. St. Ann. Supp. 1923, §§ 3115⅛e–3115⅛ff), the Department of Justice in one way or another undertook to bring about the reduction of the price of sugar, which was believed to be unwarranted. One of the means which it employed was to induce private agencies to import large quantities of sugar into the United States. There was at that time a great deal of sugar in the Argentine Republic, but it could not then be brought into the United States, because there was an embargo against exporting sugar. Through the efforts of the State Department at Washington, the embargo was lifted on May 22, 1920, on a limited amount of sugar. Early in June following, the Department of Justice requested the plaintiff to purchase a quantity of Argentine sugar for importation into the United States, to be sold under its direction, at the price fixed by it, to such essential users as it designated. With the assurance of the department that it would, upon the arrival of the sugar into the United States, attend to its distribution among essential users, canners, preservers, etc., the plaintiff purchased 5,000 tons of sugar between June 15 and June 22, 1920, and arranged for its importation.

The purchase and importation of Argentine sugar was given wide publicity in the public press and otherwise in the United States, and the price of sugar in America began to decline. After the purchase in question, but while the sugar was still in Argentine, the price of sugar in the United States fell lower than that paid by the plaintiff in Argentine. Thereupon the plaintiff requested the Department of Justice to permit a resale in Argentine, but the request was refused, because the department thought that the decline in price was only temporary, and so the plaintiff had to bring the sugar into the United States according to its agreement with the department. By the time the sugar arrived the price was still lower, and there was no market for it. The plaintiff asked permission to reship the sugar to Buenos Aires, where the price was still good, but the department denied this request, because it was feared that such shipment would disturb diplomatic relations between the countries, and so it required the sugar to be sold at such price as could be obtained here, leaving the matter of reimbursement to be determined by the department or Congress. The plaintiff sustained a loss, it is alleged, of nearly $2,000,000.

On July 8, 1918, the President, pursuant to the provision of the Act of July 1, 1918, directed the United States Food Administrator to form a corporation, to be known as the United States Sugar Equalization Board. Five million dollars was appropriated for this purpose. The incorporation was effected, and the United States held and now holds all the stock of the corporation, which

purchased the entire Cuban sugar crop of 1919, and sold it largely to the American people, at prices, it is alleged, lower than they would otherwise have been compelled to pay, and made a profit of $39,000,000. At the time of the transaction in question, $30,000,000 of this money had been paid into the Treasury of the United States, and the balance of $9,000,000 remained in the possession of the board.

After fully investigating the facts, Congress found that the plaintiff entered into and carried on this transaction at the request and under the direction of the Department of Justice, and accordingly passed the following Joint Resolution, known as "Public Resolution No. 89, 67th Congress," which was approved February 12, 1923:

"Joint resolution authorizing the President to require the United States Sugar Equalization Board (Incorporated) to take over and dispose of five thousand tons of sugar imported from the Argentine Republic.

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that the President is authorized to require the United States Sugar Equalization Board (Incorporated) to take over from the corporation P. De Ronde and Company (Incorporated) a certain transaction entered into and carried on by said corporation at the request and under the direction of the Department of Justice, which transaction involved the purchase in the Argentine Republic, between the 15th day of June, 1920, and the 22d day of June, 1920, of five thousand tons of sugar, the importation thereof into the United States and the distribution of a portion of the same within the United States, and to require the said United States Sugar Equalization Board (Incorporated) to dispense of any of said sugar so imported remaining undisposed of and to liquidate and adjust the entire transaction, paying to the corporation aforesaid such sum as may be found by said board to represent the actual loss sustained by them in said transaction, and for this purpose the President is authorized to vote or use the stock of the corporation held by him, or otherwise exercise or use his control over the said United States Sugar Equalization Board and its directors, and to continue the said corporation for such time as may be necessary to carry out the intention of this joint resolution."

About three weeks later, March 5, 1923, President Harding wrote to Mr. George A. Zabriskie, president of the board, as follows:

"As you are doubtless aware, the Congress recently authorized the President to make settlement of the claims of P. De Ronde & Co. and the American Trading Company by the United States Sugar Equalization Board. I am inclosing to you herewith copies of the resolution enacted by Congress. I have assumed that the claim of the American Trading Company needs no further investigation, because I have your letter recommending the approval of the bill authorizing its settlement. You did not speak favorably concerning the De Ronde claim. I am writing, therefore, to direct that the board make a very careful inquiry into the worthiness of this claim, with a view to reporting to me concerning the same, if possible, about April 15th. I am not directing the board to take over from the De Ronde Corporation the transaction referred to in the resolution by the Congress. If a settlement of this claim is to be made, I very much desire to negotiate the payment of certain obligations owing to the Emergency Fleet Corporation by P. De Ronde & Co. Such an executive order as is requisite for the settlement of the approved claim of the American Trading Company I will be glad to have you submit to me for my signature."

The board made inquiry in accordance with the direction contained in the President's letter, and in its report to him, which was based on the same evidence that was before the committee of Congress, said that it was "the opinion of the board that no moral or other obligation rests upon the government to recompense P. De Ronde & Co. for the loss sustained. It announces this with some reluctance, inasmuch as two committees of Congress, after hearing the evidence, have found to the contrary." The board thus overruled the action of Congress. Not having been "required" by the President to do so, the board did not "take over" the transaction and pay to the plaintiff the loss sustained by it. It has, in fact, not done any of the things specified in the resolution.

The corporate existence of the board having ceased and expired by the express limitation of its charter in July, 1923, President Coolidge, on October 6th of that year, wrote the president of the board as follows:

"Inasmuch as the Sugar Board has declined to recommend to the Executive Board that the De Ronde claims should be

indemnified from the resources of the board, and therefore no call upon its resources for this purpose is now contemplated, it seems to me highly desirable that the board should be completely wound up. I would be glad indeed if you would let me know if its activities should not be terminated and its final resources at once remitted to the Treasury and the board dissolved."

On being informed, that the board intended to wind up its affairs and distribute its assets, the plaintiff filed its bill on November 2, 1923, praying, among other things, that the board be enjoined from disposing of or conveying its property, from dividing its capital stock, and from distributing its assets to its stockholders until it had taken over the sugar transaction and ascertained and paid the plaintiff the loss which it had sustained. The cause came before the court on a motion for a preliminary injunction and a motion to dismiss the bill of plaintiff.

It is conceded by the plaintiff that the sugar transaction in itself did not create a legal and valid debt against the government for its loss. It is conceded by the board that it is within the constitutional power of Congress, and of it alone, to recognize and provide for the payment of moral and honorable claims against the government, based on principles of right and justice.

[1] Article 1, § 8, of the Constitution, provides that the Congress shall have power to lay and collect taxes and to pay "the debts * * * of the United States." The term "debts," as here used, includes claims which rest upon a merely equitable or honorable obligation, and not recoverable in a court of law against an individual. The nation owes a "debt" to an individual when his claim grows out of general principles of right and justice and is based upon considerations of a moral nature, such as are binding on the conscience or the honor of an individual, although the debt could not obtain recognition in a court of law. United States v. Realty Co., 163 U. S. 427, 440, 16 S. Ct. 1120, 41 L. Ed. 215.

The Committee on Agriculture and Forestry, to which the resolution was referred, stated in its report to the Senate that:

"The committee finds from the evidence that the purchase provided for in within resolution was duly authorized by the representatives of the President, who controls all of the stock of the United States Sugar Equalization Board (Inc.), and that such board should, as a matter of justice and equity, assume and pay the loss sustained by P. De Ronde & Co. (Inc.), in this transaction."

The House committee in its report said:

"The committee finds from the evidence that the importation of this 5,000 tons of sugar of P. De Ronde & Co. (Inc.) was duly authorized by the representatives of the President, controlling the entire stock of the United States Sugar Equalization Board (Inc.), and that said board, as a matter of equity and justice, should assume and pay the loss sustained by P. De Ronde & Co. (Inc.) in this transaction."

Thereupon both branches of Congress passed the resolution without amendment. No one contended that the claim was a legal obligation of the United States. The only other ground upon which the resolution could rest is that the loss sustained by the plaintiff is a moral obligation, which the United States in honor should pay. Consequently the passage of the resolution was the recognition by Congress that the claim was a moral obligation of the government.

[2, 3] The determination that this claim constituted a moral obligation was the exercise of a legislative power, which belongs exclusively to Congress, and which it cannot delegate. "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." It may enact a law and prescribe certain conditions under which and when it may be executed, and at the same time invest some person with power to determine the existence of the conditions and to execute the law. Congress, however, may exercise the power which it delegates to others. But, when others exercise the delegated power, they are the mere agents of the law-making body to ascertain the existence of the condition upon which its expressed will is to take effect and to execute that will. Such statutes are in the alternative, depending upon the determination by some person of whether the proper occasion or condition exist for executing them.

[4] Since Congress may not delegate legislative authority to any person, it follows that it may not give to any one absolute discretion to ignore or nullify, without conditions, a law which it has enacted. This would in effect be the delegation of legislative power. Such a delegation of power would involve a discretion of what the law

should or should not be, or that it should not be at all. Moers v. City·of Reading, 21 Pa. 188, 202; Locke's Appeal, 72 Pa. 491, 498, 13 Am. Rep. 716; Wayman v. Southard, 10 Wheat. (23 U. S.) 1, 41, 6 L. Ed. 253; Field v. Clark, 143 U. S. 649, 692, 693, 12 S. Ct. 495, 36 L. Ed. 294; Guthrie Nat. Bank v. Guthrie, 173 U. S. 528, 537, 19 S. Ct. 513, 43 L. Ed. 796; La Abra Silver Mining Co. v. United States, 175 U. S. 423, 459, 460, 20 S. Ct. 168, 44 L. Ed. 223.

[5] The real question in this case is, as Judge Morris said, "whether Congress so exercised that power in the passage of the joint resolution as to confer upon the plaintiff any rights, in the absence of affirmative action by the President." In other words, is the resolution mandatory, or merely permissive? Did it leave in the President discretion "to require" or not "to require" the board "to take over" the transaction, ascertain and pay the loss sustained by the plaintiff, just as he chose? If it left discretionary power in either, the President or board, the plaintiff cannot prevail, for admittedly neither exercised that power If it was mandatory, did it impose ministerial duties upon the President and the board, and confer rights upon the plaintiff which may be enforced in a court of equity, notwithstanding the failure of the President and the board to act?

The Senate and House Committees regarded this resolution as mandatory. In their reports to their respective bodies, they said: "It is the purpose of this resolution to direct the United States Sugar Equalization Board (Inc.) to ascertain the true amount of losses sustained on account of the purchase of the 5,000 tons of Argentine sugar by P. De Ronde & Co. (Inc.) and to pay the same out of the funds on hand in the treasury of said board." The reports are the committees' interpretation of the meaning of the resolution and are entitled to careful consideration. Church of the Holy Trinity v. United States, 143 U. S. 457, 464, 465, 12 S. Ct. 511, 36 L. Ed. 226; Binns v. United States, 194 U. S. 486, 495, 24 S. Ct. 816, 48 L. Ed. 1087; Johnson v. Southern Pac. Co., 196 U. S. 1, 20, 25 S. Ct. 158, 49 L. Ed. 363; United States v. St. Paul, M. & M. R. Co. et al., 247 U. S. 310, 318, 38 S. Ct. 525, 62 L. Ed. 1130. It was their understanding that the purpose of the resolution was to direct the board, through the President, to pay the loss, and not to leave the payment discretionary with either.

With the interpretation of the committee before it, the passage of the resolution by Congress without amendment was the recognition by it that the loss sustained in this transaction by the plaintiff constituted a moral obligation, which the United States was in honor bound to pay. The passage of the resolution was the expression by Congress of that belief. It authorized the President to continue the corporation for such time as was necessary "to carry out the intention of this joint resolution." The "intention of this joint resolution" was declared to Congress by the reports of the committees. Under the direction of the resolution, there is not a single fact or condition that the President is to find and determine before requiring the board to carry out its purpose. Congress, itself, after an exhaustive inquiry into the facts, by proper committees, determined the moral character and worthiness of the claim on which the direction to take over the transaction was founded. These had been passed upon by Congress, the only body which could direct the payment of the claim, before the resolution reached the President. Congress had assumed the responsibility for the payment.

In the case of Parish v. MacVeagh, 214 U. S. 124, 29 S. Ct. 556, 53 L. Ed. 936, Congress "authorized and directed" the Secretary of the Treasury "to make full and complete examination into the claim of Joseph W. Parish against the United States for balances alleged to be due him." The Supreme Court said that no judicial duty devolved upon the Secretary, nor had he power to determine what was right and proper, but only the administrative duty of determining the amount and paying it. No discretionary duty in the instant case devolved upon the President, on the result of which he was or was not to require the board to carry out the resolution. Neither the President nor the court may go back of the resolution. The sole question for us is its construction. The meaning of the word "authorized" is the crux of this case. Does "authorized," as used in the resolution, mean "permitted," that Congress is willing, gives its consent, but submits the whole proposition to the President for his discretionary determination? If it does, that is, in effect, the delegation of legislative power to the President. Bearing in mind that it is the President to whom Congress addressed the resolution, does the word "authorized" mean "directed"?

While the language addressed to the Pres-

ident is diplomatic and permissive in form, is it, nevertheless, mandatory in fact? In contracts and private affairs, the word "may" is permissive and discretionary. But when it is provided in public laws that a public officer "may," or "it shall be lawful" for him to, act in a certain way, it may be insisted on as a duty that he so act. What a public officer is empowered to do for others, and it is beneficial to them to have done, the law holds he ought to do. The intent of the legislative body, which is the real test, in such cases, is "to impose * * * an absolute duty." Mason et al. v. Fearson, 9 How. (50 U. S.) 248, 259, 13 L. Ed. 125. In the case of Supervisors v. United States, 4 Wall. (71 U. S.) 435, 18 L. Ed. 419, the act provided that "the board of supervisors under township organization, in such counties as may be owing debts which their current revenue, under existing laws, is not sufficient to pay, may, if deemed advisable levy a special tax * * * to be expended * * * in liquidation of such indebtedness." The supervisors refused to levy the tax. It was argued "with zeal and ability" that the act imposed no positive duty but was discretionary. The court held that the conclusion to be deduced from the authorities is that, whenever "power is given to public officers, in the language of the act before us, or in equivalent language—whenever the public interest or individual rights call for its exercise—the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demands of right, and to prevent a failure of justice. It is given as a remedy to those entitled to invoke its aid, and who would otherwise be remediless. In all such cases it is held that the intent of the Legislature, which is the test, was not to devolve a mere discretion, but to impose 'a positive and absolute duty.'"

This general rule has been established by a long line of cases, both in England and the United States. City of Galena v. Amy, 5 Wall. (72 U. S.) 705, 18 L. Ed. 560; French v. Edwards, 13 Wall. (80 U. S.) 506, 20 L. Ed. 702; United States v. Cornell Steamboat Co., 203 U. S. 184, 192, 26 S. Ct. 648, 50 L. Ed. 987. Judge Carland, speaking for the United States Circuit Court of Appeals for the Eighth Circuit, in the case of Chase v. United States, 261 F. 833, said:

"An examination of the legislation of Congress shows that in many of the acts of Congress the word 'authorized' is frequently used where a duty is imposed upon a public * * * officer, and in no case are the duties imposed discretionary unless, after the word 'authorized,' the other words 'in his discretion' are added." We see no escape from the logic and reason of this great weight of authority. The principles declared in these cases are applicable to the facts of this case under consideration and are conclusive.

We cannot impute to Congress the remotest intention of encroaching upon the President's constitutional powers. Certainly there is no evidence of it in this case. The President was selected without doubt because of his relation to this governmental agency as the most appropriate instrumentality through which Congress could execute its legislative will. While the board was organized under the laws of the state of Delaware, yet in a real sense it was the creature of the President and was empowered in its charter "to exercise powers which may be delegated to it by" him. He was thus expressly given the power in the certificate of incorporation to determine what specific powers other than those of dealing in sugar the board may exercise. It was under his control, and since Congress saw fit to direct that the loss be paid from money, representing profits on sugar transactions, in its treasury, it was proper and appropriate that the direction should reach the board through him.

Had it been the president of the board who was authorized, and not the President of the United States, we do not think that there would or could have been any escape from the doctrine of a mandatory direction as laid down by the cases of Mason v. Fearson, Supervisors, v. United States, and others cited above, and the fact that it was the President of the United States who was "authorized" does not change the application of the principle of law these cases declare, for the performance of the duty involves the exercise not of constitutional, but congressional power. It may be that President Harding thought that this resolution was permissive, but the President, like the Secretary of the Treasury, or any other executive or administrative officer, has to construe every act passed by Congress to be enforced by him. Such construction is not final, and may be judicially reviewed at the instance of those injuriously affected there-

by, and if this resolution is finally declared to be mandatory, its mandates will doubtless be carried out, for "it is always to be presumed that a public officer will do whenever called on what the law requires of him." Hoit v. Jasper County, 110 U. S. 53, 3 S. Ct. 476, 28 L. Ed. 68. And this is especially true of the President of the United States, whose constitutional duty it is "to take care that the laws be faithfully executed."

[6] The District Court held that the resolution amounted to an equitable assignment of the money in the treasury of the board to the extent and in such sum as would represent plaintiff's loss, because of the dual relation between the United States and the board, which was both a subsidiary corporation and potential debtor of the United States. Upon liquidation, the money in its treasury would belong to the United States and was subject to equitable assignment. Pomeroy's Equity Jurisprudence, § 1283. The board contends for various reasons that the facts and principles involved do not support the theory of an equitable assignment; that there is nothing in the resolution giving the plaintiff any property right in the fund.

The Act of March 4, 1915 (38 Stat. 962, 981), provides: "That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay out of any money in the Treasury not otherwise appropriated * * * to Susan Sanders * * * $1,-200." The Supreme Court held, in effect, in the case of Houston v. Ormes, 252 U. S. 469, 40 S. Ct. 369, 64 L. Ed. 667, that the passage of this act gave Mrs. Sanders such a property right in the money as would support assignment by operation of law after a claim which she had agreed to pay was allowed. While the resolution does not purport to be in form an appropriation act, yet the language is practically the same as that of such act. The plaintiff stands substantially in the same relative position in the resolution as did Mrs. Sanders in that act, and so the passage of the resolution vested in it a property right.

[7] If the board transfers the money into the Treasury of the United States before it pays the plaintiff's loss, it will be impossible to carry out the resolution. It is well settled that, when a plain official duty not requiring the exercise of discretion is to be performed, and performance will be made impossible by a threatened official act for which adequate compensation cannot be had

at law, the party who will be injured thereby may have an injunction to prevent the act. Board of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623; Belknap v. Schild, 161 U. S. 10, 16 S. Ct. 443, 40 L. Ed. 599. All that the District Court has done is to grant a preventive preliminary injunction. In other words, it has enjoined the board from putting itself in such position that the purpose of the resolution cannot be carried out. It has not, as suggested by the board, usurped the function of the President and displaced him. It has simply performed its judicial function of construing the resolution, and has prevented by injunction the board from committing an act, before it carried out the purpose of the resolution, which would result in an irreparable injury to the plaintiff, for which it would not have an adequate remedy at law.

The decree is affirmed.

BUFFINGTON, Circuit Judge (dissenting). Being of opinion that the decree of the court below, if it were enforced by a final decree, would in substance and reality be a control of the executive branch of the government by the judicial, I respectfully note my dissent. In doing so I shall not discuss the far-reaching questions involved, but confine myself to a statement of the pertinent documentary facts, from which, as it seems to me, the warrant for this dissent sufficiently appears.

By his letter to Herbert Hoover, United States Food Administrator, on July 8, 1918, Woodrow Wilson, President of the United States, authorized and directed him to proceed to incorporate the United States Sugar Equalization Board, with the powers set out in a submitted certificate of incorporation. The letter further directed: "All of the capital stock is to be held by the United States except for qualifying directors. * * * Any outstanding stock standing in the name of the United States shall be voted by you or by such person as you see fit to appoint your agent for this purpose." The described certificate was for a Delaware corporation, authorized "to purchase, or otherwise acquire, manufacture, sell or otherwise dispose of, store, handle and otherwise deal in and with raw and refined cane and beet sugar, syrups, molasses and other commodities, and to do all acts and things necessary, expedient or incidental to the efficient conduct of said business, within or without the state of Delaware," and also "to ex-

ercise all powers which may be delegated to it by the President of the United States."

In becoming a stockholder in this Delaware corporation, the government placed itself on a stockholder's status, and imparted to it none of the attributes of sovereignty. In that respect, Chief Justice Marshall said in United States Bank v. Planters' Bank, 9 Wheat. 904, 6 L. Ed. 244: "The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter." It therefore follows that the relations ·of the corporation and the government were simply those existing between a corporation and its stockholders, with the added charter provision that the corporation was "to exercise all powers which may be delegated to it by the United States."

Practically the only business the corporation did was the purchase and sale of the entire Cuban raw sugar crops of 1918 and 1919, and by December, 1919, its work was done. On December 31, 1919, the McNary Act (Comp. St. Ann. Supp. 1923, p. 1034) was passed, by which the President was authorized to continue the operation of the board.

On January 3, 1920, President Wilson decided not to exercise the authority so conferred on him to authorize a continuance, and so informed the corporation board, which on January 16, 1920, replied thereto, to the President, that, "in view of the decision from the White House, the members of the board conclude that there are no further duties for it to perform, except to proceed with the liquidation of its affairs in preparation for a dissolution. The board is acting accordingly." This proposed course of liquidation the President approved on January 30, 1920, in a letter stating "that, in view of all the circumstances, it seems proper that you proceed with the liquidation of the affairs of the United States Sugar Equalization Board as suggested."

In view of the fact that the United States was the sole owner of the corporation's stock, and that by its charter it was "to exercise all powers which may be delegated to it by the President of the United States," it would seem that the course thus directed by President Wilson of liquidating its affairs became the administrative duty of this board, and this liquidation they have proceeded with under the directions of President Wilson—and not otherwise ordered by

his successors in the presidency—until the board was otherwise ordered by the District Court of Delaware in the case now before us. Such order of that court arose in this way. On February 23, 1923, a joint resolution of the Senate and House became effective by the omission of President Harding to return it which provided:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that the President is authorized *to require* the United States Sugar Equalization Board (Incorporated) to take over from the corporation P. De Ronde & Company (Incorporated) a certain transaction entered into and carried on by said corporation at the request and under the direction of the Department of Justice, which transaction involved the purchase in the Argentine Republic, between the 15th day of June, 1920, and the 22d day of June, 1920, of five thousand tons of sugar, the importation thereof into the United States and the distribution of a portion of the same within the United States and *to require* the said United States Sugar Equalization Board (Incorporated) to *dispense* [dispose?] of any of said sugar so imported remaining undisposed of and to liquidate and adjust the entire transaction, paying to the corporation aforesaid such sum as may be found by said board to represent the actual loss sustained by them in said transaction, and for this purpose the President is authorized to *vote or use* the stock of the corporation held by him, or *otherwise exercise* or *use his control* over the said United States Sugar Equalization Board and its directors, and to continue the said corporation for such time as may be necessary to carry out the intention of this joint resolution."

On March 5, 1923, President Harding wrote to the board as follows:

"Washington, March 5, 1923.

"My Dear Mr. Zabriskie:

"As you are doubtless aware, the Congress recently authorized the President to make settlement of the claims of P. De Ronde & Co. and the American Trading Company by the United States Sugar Equalization Board. I am inclosing to you herewith copies of the resolutions enacted by Congress. I have assumed that the claim of the American Trading Company needs no further investigation, because I have your letter recommending the approval of the bill authorizing its settlement. You did not

speak favorably concerning the De Ronde claim. I am writing, therefore, to direct that the board make a very careful inquiry into the *worthiness of this claim*, with a view to reporting to me concerning the same, if possible, about April 15th. I am not directing the board to take over from the De Ronde corporation the transaction referred to in the resolution by the Congress. If a settlement of this claim is to be made, *I very much desire to negotiate the payment of certain obligations owing to the Emergency Fleet Corporation by P. De Ronde and Company*. Such an executive order as is requisite for the settlement of the approved claim of the American Trading Company I will be glad to have you submit to me for my signature.

"Very truly yours,
"(Signed) Warren G. Harding.
"Hon. George A. Zabriskie, United States Sugar Equalization Board, New York City."

From this letter it will be seen that President Harding expressly stated that he was not directing the board to take over from the De Ronde corporation the transaction referred to in the resolution quoted. From the letter it would seem, also, that the President, before so directing the taking over of the De Ronde matter by the board, desired it "to make careful inquiry into the worthiness of this claim, with a view to reporting to me concerning the same." It would seem, also, the President had in view that, if "settlement of this claim is to be made," he desired thereafter "to negotiate the payment of certain obligations owing to the Emergency Fleet Corporation by P. De Ronde & Co." Apart from this letter and the report of the board made to President Harding on June 15, 1923, after hearing the claimant, "that no moral or other obligation rests upon the government to recompense P. De Ronde & Co. for the loss sustained," no further action was taken by him.

From this correspondence, four things are clear: First that President Harding in no way suspended or changed the direction of President Wilson to the board on January 30, 1920, to "proceed with the liquidation of the affairs of the United States Sugar Equalization Board as suggested"; second, that President Harding did not then exercise the power conferred on him by the resolution, to wit, "The President is authorized to require;" third, that, before so requiring the board to take over, he desired to be advised of the worthiness of the De Ronde

claim; and, lastly, that, if the claim was to be allowed, he desired to include in its settlement certain counterclaims the government, through the Emergency Fleet Corporation, had against the claimant. From the above will be seen that President Harding did not regard the resolution as mandatory upon him to merely formally require the board to take over this De Ronde claim, but, on the contrary, it called on him to examine and decide, before he made the requirement the resolution authorized him to do, and that his conception of his duty under the resolution was not that of the court below, viz.: "That the word 'authorized,' as used in the resolution in question is mandatory, means 'directed,' and that the resolution conferred no discretionary power whatever upon the President of the United States."

That President Harding's conception of his duty as calling on him to exercise discretion was in accord with the time-honored holdings of the Executive Department is evidenced in the opinions of the Attorney General, vol. 8, p. 43, where Caleb Cushing stated: "Here, first, the President is 'authorized' to do certain things. That is a language permissive, not language mandatory, such as continually occurs in the statutes, leaving the performance of the acts, in reference to which the language is employed, at the administrative discretion of the President." And this construction of the resolution by President Harding, as calling for the exercise of discretionary powers thereunder by the President, is of great present import, for the federal courts, when called upon to construe statutes already construed and acted upon by the departments to which they are addressed, have heretofore adhered to the principles stated in U. S. v. Hermanos y Compania, 209 U. S. 339, 28 S. Ct. 533, 52 L. Ed. 821: "When the meaning of a statute is doubtful, great weight should be given to the construction placed upon it by the department charged with its execution"—and many other cases; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269; United States v. Healey, 160 U. S. 136, 16 S. Ct. 247, 40 L. Ed. 369.

President Harding's conception of duty under this resolution was followed by President Coolidge. Acting, evidently, on the adverse report made to President Harding by the board on the De Ronde claim, and that "therefore no call upon its resources for this purpose is now contemplated," President Coolidge, in a letter dated October 6,

1923, gave final directions as follows: "It seems highly desirable that the board should be completely wound up. I would be glad indeed if you would let me know if its activities should not be terminated and it final resources at once remitted to the Treasury and the board dissolved:"

Without question, this process of liquidation and dissolution ordered by President Wilson on January 3, 1920, unchanged by President Harding, and confirmed by President Coolidge October 6, 1923, would already have been carried out, had not the board been enjoined by the court below in a bill in equity filed by De Ronde & Co. against it. Can such bill and action be sustained? From the foregoing facts, it is clear that no contract relation, express or implied, exists between the defendant company and De Ronde & Co. Whatever was the duty of President Harding or President Coolidge under the resolution, one thing is certain: Neither of them has ever requested the board "to take over from the corporation, P. De Ronde & Co. (Inc.), a certain transaction, and therefore the board is in no default and owes no duty to De Ronde & Co." If default or omission to perform has occurred, and the resolution did not call on the board to act until the President required it to do so, it is not the default of the board, but solely the default or omission of the President, and he is not made a party to this bill nor subjected to mandatory process. Under such circumstances, with no contract relationship between the board and the De Ronde Company, with no imposition of any duty upon it by the act of Congress itself, and with no requisition made upon it by the President, whom Congress named as the requisitioner, it is clear there has been no default on the part of this corporation.

Whatever may, or may not, have been Congress' own power, itself, to require, in express terms, this company to take over the De Ronde transaction, Congress did not do so. Nor did Congress authorize the court to so require the board to take over that transaction. For its own reasons and in its own way, Congress made the President the requiring power, and did not follow the course the court below has followed, namely, of the company being required to act without the interposition of the President. That is the real situation, and, bluntly speaking, in my judgment, the case comes down to this: Congress, by its resolutions, did one of two things; it either authorized the President to exercise discretion before he required the

company to act, or it absolutely and unqualifiedly required the President to require. In the former case, the President's inaction is not a subject of judicial inquiry, and in the latter case, viz. refusal of the President to obey the law, the remedy, under the Constitution, is by congressional impeachment, and not by judicial decree.