343 F.3d 1193
 The CONFEDERATED SALISH AND KOOTENAI TRIBES, Plaintiff-Appellant,
v.
The UNITED STATES, Acting By and Through the Secretary of the Department of Interior, Gale NORTON; Bureau of Indians Affairs, U.S. Department of Interior, Stanley Speaks, Northwest Regional Director, Defendants-Appellees.
 No. 02-35491.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 6, 2003 — Seattle, Washington.
 Filed September 15, 2003.
 
 John B. Carter, Confederated Salish and Kootenai Tribes, Tribal Legal Department, Pablo, Montana, for the plaintiff-appellant.
 William W. Mercer, Office of the United States Attorney, Billings, Montana, for the defendants-appellees.
 Appeal from the United States District Court for the District of Montana; Donald W. Molloy, District Judge, Presiding. D.C. No. CV-01-00018-DWM.
 Before: James R. BROWNING, Arthur L. ALARCÓN, and Richard R. CLIFTON, Circuit Judges.
 Opinion by Judge ALARCÓN; Concurrence by Judge JAMES R. BROWNING.
 OPINION
 ALARCÓN, Senior Circuit Judge.
 
 
 1
 The Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation (the "Tribes") appeal from the order granting summary judgment in favor of Secretary of the Interior, Gale Norton (the "Secretary"). The Tribes sought a declaration that, upon the Tribes' request, the Secretary is required to take certain land in trust for the Tribes or the tribal member to whom the land is sold pursuant to the Act of July 18, 1968, Pub.L. 90-402, 82 Stat. 356 (the "Flathead Act"). We affirm because we conclude that the Flathead Act authorizes the Secretary of the Interior to exercise his or her discretion in acting upon tribal requests for land acquisitions within the reservation boundaries.
 
 
 2
 * The relevant portions of the Flathead Act provide as follows:
 
 
 3
 § 1. Upon request of the [Tribes] ... the Secretary of the Interior is authorized to dispose of the following described tribal lands within the exterior boundaries of the [Flathead R]eservation by sale at not less than fair market value or by exchange:
 
 
 4
 ....
 
 
 5
 The net proceeds from the sale or exchange of lands pursuant to this section shall be used to acquire within a reasonable time additional lands within the reservation boundaries in accordance with section 2 of this Act.
 
 
 6
 § 2. Upon request of the [Tribes], the Secretary of the Interior is authorized to acquire Indian or non-Indian-owned lands within the reservation boundaries for such tribes, and such lands may be held for tribal use or for sale to tribal members. Title to lands acquired pursuant to this authority shall be taken in the name of the United States in trust for the tribes or the tribal member to whom the land is sold.
 
 
 7
 Act of July 18, 1968, Pub.L. No. 90-402, 82 Stat. 356 (emphasis added).
 
 
 8
 On June 2, 1999, the Tribes requested that the Department of the Interior place in trust a forty-acre parcel of grazing land, within the Flathead Indian Reservation, which the Tribes owned in fee. In an undated decision received by the Tribes on July 9, 1999, the Bureau of Indian Affairs ("BIA") Superintendent, acting on behalf of the Secretary, approved the Tribes' request. The Superintendent's decision is not part of the record on appeal. The parties agree that in reaching his decision, the BIA Superintendent referred to some of the criteria set forth in 25 C.F.R. § 151.10.[1] Section 151.10 requires the Secretary to provide notice to state and local governments before approving discretionary land acquisitions. The Secretary need not provide such notice under § 151.10, however, if Congress has mandated the land acquisition. The Superintendent did not provide notice to state and local governments.
 
 
 9
 In face of the Superintendent's decision to grant the Tribes' request and take the forty-acre tract in trust, the Tribes, nevertheless, appealed from the decision to the Northwest Regional Director of the BIA because they were concerned that the Superintendent's reliance on § 151.10 indicated that he believed that § 2 of the Flathead Act was discretionary. The Regional Director held that the Superintendent had the discretion to grant or deny the Tribe's request. He vacated the decision of the BIA Superintendent because of the Superintendent's failure to give notice to local and state governments. The Regional Director reasoned as follows:
 
 
 10
 Because the [Flathead] Act contemplates two types of acquisitions, each must be separately analyzed to see if it is mandatory. The first type — acquisitions that will occur as a result of the disposal of lands — is mandatory. The Act states that all proceeds from the sale or exchange of the properties identified in Section 1 "shall be used to acquire" additional land within the Reservation in accordance with Section 2 of the Act. The words "shall be used to acquire ... additional lands" make those acquisitions mandatory. The reference to Section 2 describes how these mandated acquisitions will be held and authorizes their conveyance to tribal members.
 
 
 11
 In contrast, the second type of acquisition is not mandatory. Section 2 authorizes additional tribal acquisitions, using funds unrelated to the disposal of lands, and provides that this land can be conveyed to tribal members. This authority stands independent of Section 1 and no language in Section 2 suggests that these types of acquisitions are mandated. Rather, they are merely "authorized."
 
 
 12
 The Tribes appealed from the Regional Director's decision to the Interior Board of Indian Appeals ("IBIA"). The IBIA affirmed the decision of the Regional Director. The IBIA ruled that, under § 2 of the Flathead Act, the Secretary had discretionary authority to acquire land upon the Tribes' request. Confederated Salish and Kootenai Tribes of the Flathead Nation v. Northwest Reg'l Dir., Bureau of Indian Affairs, 35 IBIA 226, 232 (Nov. 9, 2000). In so holding, the IBIA did not address the Superintendent's failure to give notice to state and local governments.
 
 II
 
 13
 The Tribes filed this declaratory judgment action in the United States District Court for the District of Montana. The Tribes requested that the district court declare that the Flathead Act "is a mandatory fee-to-trust statute" and "that the Secretary ... must put title to Tribally-owned Reservation lands into trust upon the request of the Tribes, free from the participation of local governments ...." The district court granted the Secretary's motion for summary judgment. The district court held that § 2 of the Flathead Act authorized the Secretary to grant or deny the Tribes' request. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1362 and 2202. We have jurisdiction over the Tribes' timely appeal under 28 U.S.C. § 1291.
 
 III
 
 14
 The Tribes contend that the Flathead Act unambiguously mandates that the Secretary acquire land and place it in trust status upon the Tribes' request. "We review de novo a grant of summary judgment. We also review de novo questions of statutory interpretation." Bedroc, L.L.C. v. United States, 314 F.3d 1080, 1083 (9th Cir.2002) (internal citations omitted).
 
 
 15
 "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." Ariz. Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Ariz. Appetito's Stores, Inc.), 893 F.2d 216, 219 (9th Cir. 1990). In determining Congress's intent, we must first look to the words of the statute. Conn. Nat. Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). "When the words of a statute are unambiguous ... judicial inquiry is complete." Id. at 254, 112 S.Ct. 1146 (internal quotation marks and citations omitted). "Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme." United States v. Buckland, 289 F.3d 558, 565 (9th Cir.2002) (en banc) (citation and internal quotation marks omitted).
 
 
 16
 The Secretary maintains that "[t]he plain language of the Flathead Act authorizes but does not require the Secretary of the Interior to act on Tribal requests for land acquisitions." We agree. Under § 2 of the Flathead Act, the Secretary is authorized, upon request, to acquire Indian land within the reservation boundaries. The word "authorize" is defined as follows: "to endow with authority or effective legal power, warrant, or right." Webster's Third New International Dictionary 146 (4th ed.1976). "Authority," in turn, means "superiority derived from a status that carries with it the right to command and give final decisions." Id. The ability to exercise power implies discretion. Black's Law Dictionary states that "to authorize" means "to give legal authority; to empower." Black's Law Dictionary 129 (7th ed.1999). "Power" is defined as "[t]he legal right or authorization to act or not act." Id. at 1189 (7th ed.1999) (emphasis added). Another legal lexicon defines "authorize" as having "the connotation [of] being permissive, rather than mandatory." Ballentine's Law Dictionary 112 (3d ed.1969). Ballentine's also states that where "authorize" is construed to imply a mandate, it is because other words "have been used to express that intention." Id.
 
 
 17
 In § 1 and § 2 of the Flathead Act, Congress used the word "shall" to describe what the Secretary must do if he or she decides to honor a tribe's request to dispose of or acquire land. Section 1 expressly provides that the net proceeds from tribal lands disposed of by the Secretary of the Interior in the exercise of his or her authority "shall be used to acquire... additional lands." Section 2 provides that title to lands acquired by the Secretary of the Interior in the exercise of his or her authority "shall be taken in the name of the United States in trust...." Thus, Congress clearly demonstrated in the Flathead Act that it knows how to use the word "shall" when it wishes to mandate an act. Congress's use of the term "authorized" rather than "shall" in setting forth the Secretary's powers to dispose of or acquire land upon tribal request demonstrates its intent that the Secretary of the Interior should exercise his or her judgment in determining whether it is in a tribe's best interests to honor its request to dispose of or acquire land.
 
 
 18
 Because we are persuaded that the Flathead Act is unambiguous, our "judicial inquiry is complete." Conn. Nat. Bank, 503 U.S. at 254, 112 S.Ct. 1146. We lack the authority to attempt to divine Congressional intent by looking to legislative history or comparing the language used in other statutes. Therefore, we hold that the Flathead Act authorizes the Secretary of the Interior to exercise his or her discretion in determining whether to grant a tribe's request to acquire land within the reservation boundaries under § 2.
 
 
 19
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 28 C.F.R. § 151.10 provides:
 Upon ... request ..., the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, unless the acquisition is mandated by legislation .... The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when... the acquisition is not mandated:
 (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
 (b) The need of the individual Indian or the tribe for additional land;
 (c) The purposes for which the land will be used;
 (d) If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;
 (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
 (f) Jurisdictional problems and potential conflicts of land use which may arise; and
 (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
 (h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.
 (Emphasis added).
 
 
 JAMES R. BROWNING, Circuit Judge, concurring:
 
 20
 I concur in the majority's ultimate holding. I write separately because I believe that the term "authorized" is considerably more ambiguous than the majority opinion allows and that reliance on the deference due to the Secretary's interpretation of the Flathead Act is a sounder ground for affirming.
 
 
 21
 The majority is quite correct that the term "authorized" may be interpreted as connoting a delegation not only of power or authority, but also of discretion. There is, however, another, equally acceptable definition of the term. Webster's Third New International Dictionary defines the term simply to mean: "to give legality or effective legal force to." Webster's Third New International Dictionary 146 (1986). This alternative understanding of the term is reflected in the Black's Law Dictionary definition published contemporaneously with passage of the Flathead Act: "`Authorized' is sometimes construed as equivalent to `permitted'; and sometimes as equivalent to `directed'; or to similar mandatory language." Black's Law Dictionary 169 (4th ed.1968)(internal citations omitted). To illustrate the directed or mandatory use of the term "authorized", the 1968 edition of Black's Law Dictionary cites two cases, neither of which interpreted statutes that contained additional words or terms expressing mandatory intent. See U.S. Sugar Equalization Board v. P. De Ronde & Co., 7 F.2d 981, 986 (3d Cir.1925); Catron v. Marron, 19 N.M. 200, 142 P. 380, 382 (1914); see also 3 Sutherland Statutory Construction 46 (6th ed.2001)("Where statutes provide for performance of acts or the exercise of power or authority by public officers protecting private rights or the public interest, they are mandatory.").
 
 
 22
 Nor does Congress' use of the word "shall" in § 2 of the Flathead Act indicate that the term "authorized" in the same section is permissive. If "authorized" is given a mandatory meaning in the first sentence of § 2, then there is no conflict with the mandatory term "shall" in the second sentence. See In re Thrift Shoe Co., Inc., 502 F.2d 1211, 1213(9th Cir. 1974).
 
 
 23
 Although I am not convinced that the plain language of the statute allows no other construction, I believe that the Secretary's construction of § 2 of the Flathead Act is reasonable and entitled to Chevron deference.[1] The Senate Report on the Flathead Act indicates that Congress wanted the Secretary to retain discretion over Flathead Act transfers. S.Rep. No. 1134, at 2 (1968) ("The purpose of [the Act] ... is to authorize the disposal of [land on the Flathead Reservation], and to authorize the Tribes to acquire Indian-or non-Indian-owned lands to be held in trust for tribal use or conveyance to tribal members in trust. Any transfer of lands under the bill would be subject to the prior approval of the Secretary of the Interior.") (emphasis added).
 
 
 24
 The Secretary's construction of the Flathead Act is also consistent with the earlier, more general Indian Reorganization Act of 1934 ("IRA"). The IRA provides that, "[t]he Secretary of the Interior is hereby authorized, in his discretion, to acquire ... any interest in lands ... within or without existing reservations ...." 25 U.S.C. § 465. The Tribes, citing Muscogee Nation v. Hodel, 851 F.2d 1439, 1443-44 (D.C.Cir.1988), argue the omission of the term "in his discretion" from the later Flathead Act indicates that Congress intended to change the Secretary's authority from discretionary to mandatory in enacting the Flathead Act. It is, however, equally likely that the omission of these words from § 2 of the Flathead Act was intended to indicate that authority to acquire lands could now be triggered by the Tribes' request, rather than solely by the Secretary's independent decision to acquire lands for the Tribes.
 
 
 25
 The Tribes argue that this Court must interpret any ambiguities in the Flathead Act in their favor under Montana v. Blackfeet Tribe, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). In Blackfeet Tribe, the Supreme Court stated that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Id. However, this Court has held that the canon of liberal interpretation in favor of Native Americans must give way to the Chevron rule that deference be accorded to an agency's reasonable interpretation of a statute. Williams v. Babbitt, 115 F.3d 657, 663 n. 5 (9th Cir.1997)(citing Shields v. United States, 698 F.2d 987, 991 (9th Cir.1983)). Thus, the Secretary's reasonable interpretation of § 2 of the Flathead Act must be given deference.
 
 
 
 Notes:
 
 
 [1]
 The Tribes contend that the Secretary's interpretation of the Flathead Act conflicts with prior interpretations by the Department of Interior contained in a 1968 memorandum from the Billings Field Solicitor and a 1972 memorandum from the Billings Area Director. Even assuming that these memoranda represent an interpretation by the Department of the Interior, they do not support the Tribes' position. Both memoranda offer a construction of the Flathead Act that is wholly consistent with that adopted by both the IBIA and the district court. The 1972 memoranda even states that, "[t]he word `shall' as used in Section 1 is mandatory, while the word `authorized' as employed in Section 2 is permissive." Furthermore, an administrative agency "is not precluded from announcing new principles in an adjudicative proceeding and... the choice between rulemaking and adjudication lies in the first instance within the agency's discretion."NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).