UNITED STATES *ex rel.* PARISH *v.* MacVEAGH, SECRETARY OF THE TREASURY.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 111. Argued March 11, 12, 1909.—Decided May 17, 1909.

If the reference by Congress to the Secretary of the Treasury to ascertain the amount due to a claimant and pay the same requires the exercise of discretion the courts cannot control his decision, *Riverside Oil Company* v. *Hitchcock*, 190 U. S. 316; but where the statute simply requires him to ascertain the amount, according to certain prescribed rules, the duty is administrative; and, the amount being ascertained according to those rules, the courts can by mandamus compel the Secretary to issue his warrant therefor.

The statute involved in this case, referring the ascertainment of the amount due a claimant to the Secretary of the Treasury, construed on the supposition that Congress regarded the controversy as over and that only the amount remained for ascertainment, as any intricate judicial problem would naturally be referred to the judicial tribunals.

The history of the litigation and legislation in regard to the claim of Parish against the United States for damages on contract for ice made in 1863 for use of armies in the field reviewed and *held* that

under the act of February 17, 1903, c. 559, 32 Stat. 1612, directing the Secretary of the Treasury "to determine and ascertain the full amount which should have been paid to Parish if the contract had been carried out in full without charge or default by either party" and to issue his warrant therefor, no judicial duty devolved upon the Secretary, nor has the Secretary power to determine what was right or proper but only the administrative duty of ascertaining the amount and paying the same; and, the amount having been ascertained, the claimant is entitled to a writ of mandamus directing the Secretary to issue his warrant therefor.

30 App. D. C. 45, reversed.

THIS is a writ of error directed to review the judgment of the Court of Appeals of the District of Columbia affirming a judgment of the Supreme Court dismissing a petition for mandamus to require Leslie M. Shaw, then Secretary of the Treasury, to issue a draft in favor of the petitioner, plaintiff in error here, for the sum of $181,358.95, in payment of a claim referred to him by an act of Congress, approved February 17, 1903. Shaw, pending the appeal, resigned, and Cortelyou, his successor in office, was made a party in his stead, and subsequently Franklin MacVeagh, becoming Secretary, he was substituted for Cortelyou. We shall call plaintiff in error relator and defendant in error respondent, they having occupied that relation in the trial court.

J. W. Parish, of whose estate relator is executrix, entered into a contract with the United States, as J. W. Parish & Company, to deliver, for the use of the United States medical department at Memphis, St. Louis and Cairo the whole amount of ice required to be consumed during the remainder of the year 1863. The quality of the ice was to be "A No. 1," and the contract stated the prices to be paid at the designated points respectively. On March 25, 1863, Joseph B. Brown, by instruction of the Assistant Surgeon General, issued an order directing Parish to deliver the ice as follows: St. Louis 5,000 tons, Cairo 5,000 tons, Memphis 10,000 tons and Nashville 10,000 tons, "making a total," the order recited, "of 30,000 tons which you have contracted to deliver. The ice to

be delivered at Nashville and Memphis is for the use of the sick of the armies in the field, and should be furnished without delay." Parish immediately proceeded to execute the order, and was performing it when, on March 31, 1863, he received a letter from the Assistant Surgeon General, under instructions of the Surgeon General, suspending the order of March 25 until instructions should be received from the Surgeon General. At the date of this letter 12,768 tons of ice had been delivered and paid for at the contract price. The order of suspension was never recalled. Under the authority of an act of Congress, approved May 31, 1872, Parish brought suit against the United States to enforce his demand under the contract. The Court of Claims dismissed the suit. 12 Ct. Cl. 609. This court reversed the judgment and remanded the case, with directions to ascertain the damages sustained by Parish. 100 U. S. 500. The Court of Claims rendered judgment for the claimant for the sum of $10,444.91. 16 Ct. Cl. 642. Parish then petitioned Congress to satisfy as much of his claim as had not been satisfied by the Court of Claims. Responding to a reference by a committee of the House of Representatives, the War Department, through the Surgeon General, reported that the whole of the undelivered ice, through the order of suspension, amounted to 17,232 tons, and the same had been lost by the contractor. The report also stated that under the evidence before the Court of Claims, and additional evidence before the department, Parish was entitled to be reimbursed, in addition to the judgment of the Court of Claims, in the sum of $58,341.85, for the loss he had sustained because of the non-delivery of the 17,232 tons. After this report, on February 20, 1886, Congress passed an act directing payment of said sum of $58,341.85 to Parish, in addition to said sum of $10,444.91, being the balance of money laid out and expended by him in the purchase of 17,232 tons of ice for the use and at the request of the Government of the United States, which were not afterwards called for, but were wholly lost to the said Parish. 24 Stat. 653. Parish again

applied to Congress for relief, and, on February 17, 1903, the act in controversy was passed.  It will be given in the opinion.

*Mr. Holmes Conrad* and *Mr. Leigh Robinson* for appellant:

In performing the duty laid upon him by the act of 1903, the Secretary of the Treasury was not acting in the exercise of judicial or discretionary but only of ministerial powers. *Marbury* v. *Madison*, 1 Cranch, 70; *Kendall* v. *United States*, 12 Pet. 524; *United States* v. *Black*, 128 U. S. 48; *People* v. *Supervisors of Otsego*, 51 N. Y. 401.  Cases cited by the Court of Appeals, viz.: *Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316; *United States* v. *Black*, 128 U. S. 40, and others, reviewed and distinguished.

A ministerial duty is one to be performed or exercised on a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and irrespective of the judgment of him on whom the duty is imposed as to the propriety of the performance.  *Commonwealth* v. *Justices of Fairfax County*, 2 Virginia Cases, 9; *Betts* v. *Dimon*, 3 Connecticut, 107; *Flournoy* v. *City*, 17 Indiana, 174; *Supervisors* v. *United States*, 4 Wall. 435; *Kendall* v. *United States*, 12 Pet. 593, 594.

The findings of the Court of Claims are like a special verdict, where a jury find the facts of the case, and refer the decision of the cause upon those facts to the court.  So far as they go, the findings constitute "the evidence collected in the case in the Court of Claims."  *Lumber Co.* v. *Buchtel*, 101 U. S. 638; *Suydam* v. *Williamson*, 20 How. 432; *Stone* v. *United States*, 164 U. S. 382; *United States* v. *Smith*, 94 U. S. 218; *United States* v. *New York Indians*, 173 U. S. 470; *Stanley* v. *Supervisor*, 121 U. S. 547; *Runkle* v. *Burnham*, 153 U. S. 225; *Consolidated Canal Co.* v. *Mesa Canal Co.*, 177 U. S. 302.

A rule for the measure of damages which directs that in case of breach of contract the injured party shall receive from the defaulting party just what would have been received had there been no default is a perfectly plain rule which has no tendency to mislead anyone, and therefore did not mislead

the auditor who stated the account. The rule is not one of novelty. *United States* v. *Behan*, 110 U. S. 338; *Alder* v. *Keightly*, 15 M. & W. 117; *Hadley* v. *Boxendale*, 10 Exch. 341; *Benjamin* v. *Hilliard*, 23 How. 167.

Assertion of unspecified evidence, alleged to exist in contravention of proofs clearly presented in the petition, is assertion having no probative force. Such allegation, when made for the purpose of impairing the effect of existing judgments, would be irrelevant, even if the allegation could be proved and had been proved.

Profits which admit of "clear and direct proof" and profits which are "remote and speculative in character" can be distinguished as follows: In the former case the gross result of the work under the contract is a sum fixed absolutely, and the cost of the work is able to be fixed with something like certainty. In the latter case the gross result is speculative and contingent, depending upon the fluctuation of the market and the chances of business. This is too remote. *Coosaw* v. *Mining Co.*, 75 Fed. Rep. 865.

When it is known with mathematical certainty what the gross result would be there is no speculative or precarious element present to be considered.

When, as stated by the Law Board, "under the act of February 17, 1903, there is not a single question of fact to be determined other than the amount saved to the contractor by the non-delivered portion of the ice," all the other deductions directed by the act having been previously determined; so that, "after the determination of the amount saved to the contractor by the non-delivery of the undelivered portion of the ice, the case presents simply a mathematical proposition;" nothing is left for the exercise of judicial or other discretion. There is no right of private judgment as to the response to be given to a mathematical proposition.

*Mr. Assistant Attorney General Russell* for appellee:

The act of Congress herein in question was not an un-

equivocal order to the Secretary of the Treasury to make a simple calculation which could have been made in a short time by any accountant, but was a reference to the Secretary of the entire question whether any amount was due to the claimant, and, if so, what amount.

Claimant's theory is that the Secretary should have determined from evidence collected by the Court of Claims how much he saved by not having to deliver the ice he claims to have purchased. And that is a business as purely addressed to the judgment and discretion of the Secretary as can be imagined.

The weighing of evidence and drawing conclusions from it are two of the most important and characteristic functions of the judiciary.

It is not to be supposed that practical men in Congress intended the public moneys to be paid out until there should be a full and complete examination of the claim and a determination, as a result thereof, that a balance was really and fairly due the claimant by virtue of a contract.

He is to get his facts from the evidence "collected." He is not told to regard the findings of the Court of Claims or decisions of the Supreme Court, or the act of 1886 allowing the $58,000, partly on evidence said to be on file in the War Department, as so many things adjudicated.

On the contrary, he is to examine the claim *de novo* in spite of the most solemn and authoritative adjudications on matters of fact and law.

The theory of standing by adjudications obviously would be fatal to the appellant's case.

It is because the Supreme Court says the Court of Claims had erred and the committees said this court had blundered that the Secretary is called in to examine the evidence collected and make a full and complete examination in the light of that and of the supposedly new and improved rule of *Behan's case* for the measure of damages.

From this it follows that he can make up his own mind as to

how many tons were actually purchased, paid for, and not delivered.

He might reach a wholly different conclusion from that attributed to the Surgeon General in 1886, especially as he has not the same evidence before him.

Appellant did not, as that rule contemplates, lose these profits because the one party prevented delivery without fault of the other party. The Court of Claims found he was not in a condition to deliver the ice because transportation was impossible. That was not the other party's fault, but his misfortune or miscalculation.

Nor is there any room in this case, and especially as to that ice, for the principle that failure to tender is no breach, if the other party clearly shows that acceptance would be declined. For the record indicates, it seems to us, that the Government took about all the ice that was actually offered to it and could be delivered under the contract. Ice in large quantities was taken at all four places—St. Louis, Cairo, Memphis, Nashville. And there is no indication that any ice was declined.

We understand that the question here, as the case is presented, is, Shall the Secretary be ordered to accept the finding of the auditor as conclusive?

Obviously the special act does not require that he should. That is too plain for argument.

However, supposing a proper case had been presented to raise the other question, Was the Secretary given a mere order to do a thing about which people could not differ or was he ordered to use his judgment? The answer is equally obvious.

Mr. Justice McKenna, after making the foregoing statement, delivered the opinion of the court:

It will be observed that the controversy in this case started in a contract of no uncertainty of meaning, and an ordinary action for damages for its breach, but has accumulated incidents and complexity, and has finally terminated in a dispute over an ambiguous statute.

The case was submitted in the Supreme Court of the District upon what may be called a demurrer to the return, which was regarded, and is now regarded, as presenting the question of the power of the Secretary of the Treasury under the act of Congress. This is the ultimate question. If that officer had the power, which he asserts in his return, to review the evidence taken in the Court of Claims, and to "make such findings" as might "seem right and proper to him," the judgment of the Court of Appeals must be affirmed. As we may not control the Secretary's discretion (*Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316), we can have no concern with the reasoning advanced by him to support its exercise.

As we have seen, in the first suit brought by Parish the Court of Claims decided against him. It based its decision on the ground that the Assistant Surgeon General had no "right to interpret the contract and decide that it called for 30,000 tons of ice, and direct how it should be delivered." The court, however, found the facts. It found as follows: "IX. The said Parish was *prepared and willing* [italics ours] to deliver the said 30,000 tons of ice in conformity with the conditions and obligations of his said contract and the terms of said letter of March 25, 1863, of which the defendant had notice, but they would not, nor did receive more than the 12,768 tons aforesaid." This finding is quoted in the reports of the Congressional committees as one of the elements inducing their recommendation of the passage of the bill.

This court disagreed with the Court of Claims upon the question of the authority of the Assistant Surgeon General, and reversed that court, but decided that the measure of Parish's damages was "the cost of ice purchased at Lake Pepin and lost, the expense bestowed upon its care and the time and expense of making that purchase, and any sum actually lost in regard to the other 17,232 tons of ice purchased to enable them to meet the requirements." This ruling was based on the assumption that Parish "neither delivered nor offered to deliver the remainder."

The Court of Claims, upon the return of the case to it, found obstruction in its rules to taking additional evidence, but on that before it made an award in favor of Parish in the sum of $10,444.91.

He was dissatisfied, and justly dissatisfied. He appealed to Congress, the petition alleges, and respondent does not deny the allegation, for "the means of satisfying so much of his claim as the court of last resort had adjudicated to be his unquestionable right." The petition further alleges (again with no denial by respondent) that his "claim was referred by the House committee to the War Department for report. The Surgeon General found that the whole amount of undelivered ice, viz., 17,232 tons, was lost to said Parish, and ascertained the cost thereof." Congress passed an act February 20, 1886, appropriating the sum of $58,341.85 to pay that loss. 24 Stat. 653–654. By the payment of the money appropriated, Parish received the contract price on the ice actually delivered, namely, 12,768 tons, and, in addition, what he had actually spent and actually lost on account of the balance, namely, 17,232 tons of ice. This is not denied, nor that that which was paid to him was only that which this court had decided should have been paid to him January 1, 1864. "That is to say," to quote from the petition, "the said Parish had not only lost the interest on this large sum of money for more than two decades, but had been forced to meet the expense of litigating the claim, and had been subjected to the labors and anxieties and trials of prosecuting the same."

The next step was the passage of the act in controversy and we come to its consideration and the determination of how its ambiguity, if indeed it have any, is to be resolved. It had, we may say at the start of our discussion, its impulse in the belief that injury had been done to Parish, and it was intended to provide a means of redress. Keeping in view this purpose, we may get light by which to interpret the act.

As we have already said, the ruling of this court in *Parish* v. *United States*, 100 U. S. 500, was based on the assumption that

Parish had "neither delivered nor offered to deliver" the 17,232 tons of ice, the non-acceptance of which has given rise to this controversy. Commenting on that declaration the committees of Congress called it a "mistaken allegation" and a "false assumption," and said that the decision of the court turned upon it. The committees further said that the court "entirely overlooked" finding IX of the Court of Claims, and that the "result of this oversight was to cause the court to lay down a rule of damages inconsistent with the facts and unjust to the parties." The committees then reviewed certain cases, among others *United States* v. *Behan,* 110 U. S. 338, and declared that the latter case established the *prima facie* measure of damages for a breach of a contract sustained by the injured party to consist of "two distinct items or grounds of damage, namely, first, what he has already expended toward performance less the value of material on hand; secondly, the profits that he would realize by performing the whole contract." The report recognized that profits cannot always be recovered, that they may be remote and speculative, incapable of that clear and direct proof which the law requires. But it is manifest that the committees did not think the case called for that limitation, for it was said that the reasons for the application of the "equitable rules in the *Behan case* were not nearly so clear and strong as in the *Parish case,*" and declared as follows:

"In the latter case the contract expressly provided what should be paid for the ice delivered at the various places named. The profits, therefore, were readily and easily ascertainable. In fact, that was the theory of the plaintiff in making his case before the Court of Claims, and the record of that court shows that the proofs on that point were explicit, bringing the case properly within the principles laid down in *United States* v. *Behan.*

"In a word, it is perfectly clear that the Supreme Court quite overlooked one of the most important findings of fact in the *Parish case.* At all events, there is no doubt that the law

is properly stated in the *Behan case.* And all the present bill contemplates is a final and proper settlement on the rule of law which is older than our republic, and is everywhere recognized as the only equitable one that can be applied in the premises."

It is manifest, therefore, that the act was passed under the conviction that Parish had rights which had not been satisfied, and we are brought to the consideration of the act as the means of satisfying them.

The act provides "that the Secretary of the Treasury is hereby authorized and directed to make full and complete examination into the claim of Joseph W. Parish against the United States for balances alleged to be due him by virtue of a contract made by Joseph W. Parish & Co., with Henry Johnson, medical storekeeper, acting on behalf of the United States. . . . That the Secretary shall determine and ascertain the *full amount which should have been paid said J. W. Parish & Co., if the said contract had been carried out in full without change or default made by either of the parties thereto,* [italics ours] under the ruling of the measure of damages laid down by the Supreme Court of the United States in the case of *United States* v. *Behan,* 110 U. S. 338, and *in accordance with the evidence in the case collected by the United States Court of Claims* [italics ours], and for determining the full amount thus due, . . . under said contract and rule of law aforesaid, to deduct therefrom all payments . . . stating what balance, if any, is due under the ruling and evidence presented herein, and pay the said balance to said Joseph W. Parish, the present owner of said claim; and sufficient money to pay such balances is hereby appropriated out of any money in the Treasury which has not been otherwise appropriated." 32 Stat. 1612, c. 559, February 17, 1903.

The issue between the parties in their ultimate statement is as follows: Relator contends that the Secretary was directed to ascertain what amount Parish should receive under the contract, "which he was ready, able and willing to carry out." Respondent contends that the Secretary was to pass on the

evidence taken in the Court of Claims, and make such finding as might seem right and proper to him. In other words, to exercise judgment and discretion.

To sustain their respective contentions the parties do not urge the same words as the tests of the meaning of the statute. The appellant, to determine the Secretary's duty, puts emphasis on the provision that he was to ascertain the "full amount which should have been paid . . . if the contract had been carried out in full, without change or default made by either of the parties thereto." Respondent finds difficulty with that provision, and says that "at first glance" it "may look positive and arbitrary." But, it is urged that the clause "does not say which *would* have been paid, but which 'should' have been paid, and when we turn to the 'contract' an ambiguity immediately arises, because the contract, 'carried out in full,' did not call for any particular quantity of ice." And to remove the effect of the certainty in the quantity of ice required made by the order for 30,000 tons, it is said that the "special act nowhere speaks of this order, but only of the contract." The final comment is that "no other clause of the act seems to be worth quoting as an unambiguous order to make an arbitrary calculation and allowance," while the act "in places unequivocally requires something different from an arbitrary calculation." To support this it is urged that the act directs a full and complete examination of Parish's claim for a balance alleged to be due him by virtue of the contract. To do this, it is argued, "would require as much judgment and discretion as the Secretary could muster." A striking contrast is exhibited to this by declaring that the duty required of the Secretary under appellant's contention was "to do a sum in arithmetic which any school boy could do in five minutes; that is, multiply the prices per ton with the 30,000 tons and deduct the amount already paid, as per receipts on file in the Treasury."

It is elementary that all the words of the statute must be considered in determining its meaning, and we may not,

therefore, disregard the provision of the statute which directs the Secretary to determine and ascertain the full amount which should have been paid if the said *contract had been carried out in full without change or default made by either of the parties.* And it seems to us that these words express the subject of inquiry, the exact command to the Secretary to which the other provisions of the statute are subordinate. He was not to determine if Parish was in default. That inquiry was precluded. It had been adjudged otherwise by the Court of Claims and by this court. It had been declared otherwise by the legislature. The act of Congress of February 20, 1886, passed to complete the judgments of the courts, appropriated the sum of $58,341.85, "being the balance of money laid out and expended by him (Parish) in the purchase of 17,232 tons of ice, for the use and at the request of the Government of the United States, which were not afterwards called for, but *were wholly lost to said Parish*" (the italics ours).

The following things therefore had been determined: The existence of a contract for the delivery of ice, quantity not mentioned, at different points and at different prices. The quantity was afterwards fixed at 30,000 tons and the contract made specific in every particular, quantity, quality, places of delivery and prices. Performance was undertaken and 12,768 tons delivered. Then came the order of suspension—not revocation, it must be kept in mind, and Parish had to keep prepared. He was not permitted to fulfill his contract, he dared not be unprepared to do so upon any notice. This court in *Parish* v. *United States, supra,* has portrayed the situation. The demand upon him was "an unequivocal demand," the court said, for 30,000 tons, and "to enable him to fulfill this demand . . . required promptitude and diligence in securing the ice." The court states why. A moment's reflection on the situation shows us why. The ice was needed for the use of the armies in the field. It might be demanded at any time. The necessity for it might be imperative. If Parish could not have supplied it, this court said, the officers of the

Government would have procured it at any price in the market, a price which would have been enormously enhanced by that very demand, and Parish would have been liable for the difference between such price and the contract price. He was, therefore, this court said, "under an imperative necessity to prepare to fulfill this requirement." He realized his situation, and that he prepared against its contingencies was the finding of the Court of Claims, it was the declaration of Congress in the act of February 20, 1886, and it was the repeated declaration of the committees of Congress in their recommendation of the passage of the act in controversy. We see now the reason for regarding the opening clause of the act as its principal and dominating clause. We see now why his readiness to perform, the possession of the means of performance and the offer of performance were to be assumed by the Secretary and the loss of profits only was to be determined. And the profits, the committees said, "were readily and easily ascertainable." Indeed, because they were, their calculation was referred to an executive officer. If to ascertain them involved an intricate judicial problem the reference would have been to the judicial tribunals, for we cannot agree with the intimation of the Government that Congress would imagine that the Court of Claims and this court were unable "to master the difficulties" of that problem. The better supposition is that Congress regarded the controversy as over and that the time for reparation had arrived, and, that it might be quick and complete, referred the matter to that officer who could best state the balance due and pay it.

It does not militate with this conclusion that the duty enjoined was simple. The committees of Congress believed it to be so, believed that the extent of relief to which Parish was entitled and the items of it had been established. The act in controversy was the expression of that belief. Its purpose was relief shown to be due from a problem already solved, not to start another problem. The duty enjoined required a reference in a sense to evidence, it may be, but it was to evidence

whose probative force had been estimated and declared. It conduced to but one conclusion. That conclusion was stated by the Auditor of the War Department, following the direction of the statute, to be a balance in Parish's favor of $181,358.95. This amount represented the amount that Parish should have received over and above what he was paid by direct payment, judgment or appropriation by Congress and the balance due him under the rule in the *Behan case.*

> *The judgment of the Court of Appeals is reversed, and that court is directed to reverse the judgment of the Supreme Court and direct the latter court to sustain the demurrer of relator to the return of respondent and enter judgment as prayed for in petition of relator.*

MR. JUSTICE MOODY took no part in the decision.