**HINES, Adm'r of Veterans' Affairs, et al. v. UNITED STATES ex rel. MARSH.**

No. 7214.

United States Court of Appeals for the District of Columbia.

Decided April 17, 1939.

David A. Pine, U. S. Atty., Allen J. Krouse, Asst. U. S. Atty., James T. Brady and John M. George, of the Veterans' Administration, and Albert A. Peter and R. L. Golyi, of the General Accounting Office, all of Washington, D. C., for appellants.

C. L. Dawson and Warren E. Miller, both of Washington, D. C., for appellee.

Before STEPHENS, MILLER, and VINSON, Associate Justices.

VINSON, Associate Justice.

James S. Cathcard, a World War Veteran, entered the military service on May 11, 1918, and purchased War Risk Term Insurance which was subsequently converted in the amount of $7,000. He was discharged on July 5, 1919. Service-connected disability benefits from July 6, 1919, were awarded and paid to him. He re-enlisted on August 30, 1920, and deserted on September 14, 1920. He was apprehended in 1926 and discharged on April 19, 1926, on account of desertion, not admitted, and physical unfitness. This discharge was not honorable.

After his discharge on April 19, 1926, the Administrator of Veterans' Affairs, in accordance with provisions of the World War Veterans' Act of 1924, as amended,[1] (hereinafter called the Act), recognized that he was insane and waived forfeiture of all rights, claims and benefits; waived recovery of the overpayments of compensation and vocational allowance prior to discharge from his second enlistment because of his insanity; and determined that he was entitled to compensation at the rate of $80 per month, the total disability rate at that time from discharge (second enlistment) which was paid to November 30, 1928.

On October 5, 1926, he was adjudged to be of unsound mind in a court of competent jurisdiction in Minnesota. In February 1932 the Administrator reviewed the previous decision and declared a forfeiture of all rights, claims and benefits under Titles II and IV of the Act, 38 U.S.C.A. §§ 422, 471 et seq., 531 et seq., which included payments of compensation made to him between October 5, 1926, and November 30, 1928. The Administrator declared this forfeiture under the provisions of sec. 504 of the Act, 38 U.S.C.A. § 555, because of alleged fraud practiced by the veteran in connection with his claim for benefits under the Act. Seemingly this action grew out of a court order of January 30, 1928, in the Minnesota court in which the veteran was restored to capacity and his guardian discharged.

However, before the Administrator had taken this action forfeiting the veteran's rights under the Act, he had been again declared incompetent and his mother, Helen L. Marsh, appointed legal guardian by a court in Nebraska. Through her he made a claim for insurance payments to the Administrator on January 27, 1932, alleging that he was totally and permanently disabled. The Administrator denied the claim for insurance on May 24, 1935, whereupon his guardian filed suit in the District Court of the United States, District of Nebraska, against the United States, for this insurance claim. Judgment was ren-

[1] Act of June 7, 1924, c. 320, 43 Stat. 607, 38 U.S.C.A. § 421 et seq.

dered in favor of the veteran's claim by the District Court on July 8, 1936. This judgment was never appealed and became final and binding upon the United States.

Because of this judgment, in the ordinary course of business, and in accordance with administrative procedure, as contemplated by the governing statutes, an award was made by the proper officers of the Veterans' Administration, and a voucher in payment of the judgment was submitted to the General Accounting Office for pre-audit prior to payment. The voucher was returned without certification for payment by the General Accounting Office accompanied by a memorandum which suggested that the proceeds of the judgment should be applied in liquidation of an indebtedness due the United States from the insured. This memorandum recited that the veteran had been paid approximately $5,000 for compensation and $1,018.66 for vocational training; and further that he had violated provisions of sec. 504 of the Act, 38 U.S.C.A. § 555, and thereby forfeited all rights, claims and benefits under Title II and Title III of the Act, 38 U.S.C.A. §§ 422, 471 et seq., 511 et seq. Pursuant thereto, the Administrator determined that the veteran had been overpaid disability compensation amounting to $7,091.61 and vocational training pay amounting to $1,018.-66. Thereupon the Administrator submitted to the Comptroller General a substitute voucher, for pre-audit before payment, which directed that a check for the entire amount due the veteran be drawn to the Treasurer of the United States as partial liquidation of the veteran's indebtedness to the United States as determined by the Administrator. This amount was certified for payment by the Comptroller.

His guardian (hereinafter called appellee) on February 21, 1938, filed a petition in the District Court of the United States for the District of Columbia for a writ of mandamus praying that the Administrator of Veterans' Affairs be commanded to make a proper award under the judgment obtained, and that the Acting Comptroller General of the United States be required to certify for payment to the Treasury the sum determined to be due under the judgment. A rule to show cause was issued. After hearing and demurrer filed by appellee the court on May 9, 1938, sustained the demurrer and issued the writ of mandamus. Appellants took proper exceptions to the order of the district court and are here on appeal.

The question for decision is: Shall mandamus issue to compel payment of a judgment debt of the United States without set-off of non-judgment claims alleged to be due the United States in virtue of findings by the Administrator that there had been overpayments in compensation and vocational training pay to the judgment creditor? Appellee bases her right to have the writ of mandamus issue under the provisions of the Act of March 3, 1933, 47 Stat. 1516, 31 U.S.C.A. § 227 (hereinafter called the Act of 1933).

Under the plain provisions of the Act of 1933[2] it is the duty of the Comp-

[2] Act of Mar. 3, 1933, c. 212, Title II, 47 Stat. 1516, 31 U.S.C.A. § 227.

"§ 227. Offsets against judgments and claims against United States. When any final judgment recovered against the United States duly allowed by legal authority shall be presented to the Comptroller General of the United States for payment, and the plaintiff therein shall be indebted to the United States in any manner, whether as principal or surety, it shall be the duty of the Comptroller General of the United States to withhold payment of an amount of such judgment equal to the debt thus due to the United States; and if such plaintiff assents to such set-off, and discharges his judgment or an amount thereof equal to said debt, the Comptroller General of the United States shall execute a discharge of the debt due from the plaintiff to the United States. But if such plaintiff denies his indebtedness to the United States, or refuses to consent to the set-off, then the Comptroller General of the United States shall withhold payment of such further amount of such judgment, as in his opinion will be sufficient to cover all legal charges and costs in prosecuting the debt of the United States to final judgment. And if such debt is not already in suit, it shall be the duty of the Comptroller General of the United States to cause legal proceedings to be immediately commenced to enforce the same, and to cause the same to be prosecuted to final judgment with all reasonable dispatch. And if in such action judgment shall be rendered against the United States, or the amount recovered for debt and costs shall be less than the amount so withheld as before provided, the balance shall then be paid over to such plaintiff by such Comptroller Gen-

troller General of the United States, whenever a plaintiff denies his indebtedness to the United States or refuses to consent to the set-off, "to cause legal proceedings to be immediately commenced to enforce" the indebtedness due the United States which is sought to be set-off against a valid judgment obtained against the United States "and to cause the same to be prosecuted to final judgment with all reasonable dispatch." This provision for requiring claims of the United States to be reduced to judgment before permitting them to be set-off against a judgment creditor was first enacted in the Act of March 3, 1875, c. 149, 18 Stat. 481, 31 U.S.C.A. § 227. In that Act the Secretary of the Treasury was the officer upon whom fell the duty "to cause legal proceedings to be immediately commenced" to reduce such claims to judgment. In the Act of March 3, 1933, the Comptroller General was substituted as the officer impressed with this positive duty. This statute provides that whenever the government claims a set-off not reduced to judgment and not in suit against a judgment debt due by it, and the judgment creditor denies the government's claim against him and refuses to consent to the set-off, suit must be instituted to recover the claimed set-off in a judgment of a court. It takes nothing short of this to justify withholding money adjudged by a court to be payable by the government. This mandate of the law is not met by the administrative finding of indebtedness. The statute is mandatory that if the "debt" claimed by the United States is not "already in suit," it is the duty of the Comptroller General to cause "legal proceedings" to be commenced to enforce the claimed debt and to cause such proceedings to be "prosecuted to final judgment." This statutory direction is not met by a mere determination of a debt by the Administrator.

Appellants maintain that under sec. 504, Title V of the Act, the Administrator is empowered without right of review in the courts, not only to forfeit all rights, claims and benefits under Titles II, III, and IV of the Act, but empowered, without notice and hearing, to recover the compensation and vocational training allowance theretofore paid the veteran in a set-off to the judgment claim as though the alleged overpayments were reduced to judgment.

An analysis of the entire World War Veterans' Act shows that the Administrator has the responsibility of extending relief to veterans of all wars, and their dependents, under the provisions of the various acts of Congress. Direct provisions of these laws include pensions, government insurance, military and naval insurance, adjusted compensation, emergency officers' retirement pay for veterans of the World War, and hospital and domiciliary care for veterans of all wars. Sec. 5 of the Act, 38 U.S.C.A. § 426, provides that the Administrator "shall decide all questions arising under this Act [chapter]; and all decisions of questions of fact and law affecting any claimant to the benefits of Titles [Parts] II, III, or IV of this act [chapter] shall be conclusive except as otherwise provided herein." Title II pertains to compensation, Title III to insurance, and Title IV to vocational rehabilitation.

It is settled that decisions of questions of fact and law relating to claims under insurance policies are withdrawn from such conclusive status in virtue of its own express language "except as otherwise provided herein," sec. 19 of the Act, 38 U.S.C.A. § 445, and many court decisions so holding. However, the Comptroller General in his memorandum refusing certification of the original voucher would indicate that he still labored under the impression that the Administrator's findings of fact were conclusive in respect of Title III.[3] He continued this error in his answer filed herein. In view of sec. 19 of the Act and the long line of decisions contra he cannot maintain this position.

We recognize the force of sec. 5 of the Act, supra, in respect of findings of fact in disagreements not pertaining to insurance, that is, those relating to benefits to a claimant growing out of Titles II or IV.[4]

eral of the United States with 6 per centum interest thereon for the time it has been withheld from the plaintiff."

[3] As a matter of fact the Central Committee on Waivers and Forfeitures of the Veterans' Administration determined that appellee had violated the provisions of sec. 504, and consequently had forfeited all right, claims and benefits under Titles II and IV of the Act. This appears clearly from the original report of that Committee which is before us as an exhibit.

[4] Lynch v. United States, 292 U.S. 571, 581, 587, 54 S.Ct. 840, 78 L.Ed. 1434.

But, in the present case it is not a determination under Titles II or IV that is involved. The determinations herein are made under Titles I and V, 38 U.S.C.A. §§ 421 et seq., 551 et seq.

 The language of sec. 504 empowers the Administrator to forfeit the claim of a veteran to all rights, claims, and benefits under Titles II and IV as provided therein. We find no authority, however, in this section that authorizes or directs the Administrator to recover overpayments from the veterans, or that his determination in respect of recovery of overpayments is conclusive. It is under sec. 205 of the Act, 38 U.S.C.A. § 494, that the Administrator is authorized in the case of fraud to reduce compensation benefits retroactively. It is in this manner that he may find that overpayments may be recovered. However, the determination of fraud upon which he acts retroactively is clearly made under sec. 504, Title V, of the Act, in the present case, and as we have heretofore seen, such determination is not of a conclusive nature. Sec. 5, supra.

 While Congress may limit the benefits to the veteran under Titles II and IV to the discretion of the Administrator, the language of the statute does not give him the power to enter judgments against the veteran in an ex parte proceeding, without notice and hearing. The mere fact that the government makes conclusive the discretion of the Administrator in granting the benefit does not carry with it a conclusiveness in discretion in taking it away retroactively. As we read the statute Congress never attempted to vest in the Administrator a right to enter a judgment or to deprive a veteran of property without due process of law.

 We do not find any language in the statute that makes conclusive the facts found under Title I or Title V. The Comptroller General in this case stoutly maintains that such power is found in the statute. Yet within 15 days after appeal was brought in this case we find him vigorously maintaining with the Administrator, who has been guided by him completely in this case, that, in a matter of an attorney's fee which falls within Title V, the decisions of fact by the Administrator in questions arising under Titles I and V are not conclusive.[5]

It is the judicially established judgment which allows the government to reduce by, and off-set, the judgment obtained against it, and not the administrative determination that a set-off exists, or might exist. While this statute is declaratory of prior existing rights permitting the government to strike a balance between debtor and creditor, it is likewise declaratory of prior existing protective rights of citizens against bureaucratic determinations, which rights have been firmly entrenched in our system of government by division of sovereign powers and the "due process" clause of the Constitution, U.S.C.A. Const. Amend. 5.[6]

---

[5] The Comptroller General in a letter of June 29, 1938, A–95282, involving the case of Jesse McCampbell Reed, XC–223,368, to the Administrator of Veterans' Affairs, said:

"This office has taken the position in this and all other judgment cases that this office is authorized and required to determine in the audit whether the payment proposed to be made by the Veterans' Administration is strictly in accordance with the terms of the judgment."

"It is understood to be your present position that the action of the Veterans' Administration in judgment cases arising under section 19 of the World War Veterans' Act as amended, is final and conclusive by reason of the provisions of section 5 of the same act * * *."

"Evidently, you have overlooked the fact that attorneys' fees are payable only as provided for in section 500, title V, of the World War Veterans' Act * * *."

"You will note that neither title I nor title V is mentioned in section 5 of the World War Veterans' Act, as amended * * *."

"I cannot agree with the view that the action of the Veterans' Administration in making payments of War Risk Insurance or attorneys' fees pursuant to court judgments is final and conclusive. Accordingly, in the audit of accounts or claims involving such payments, this office will continue to determine whether such payments, made or proposed, are strictly in accordance with the terms of the judgments of the courts."

[6] In 1858, prior to the amendment of 1875, Hon. Jeremiah S. Black, then Attorney General of the United States, in considering the matter of set-offs in Claim of Reside, 9 O. A. G. 197, did not think there would be "impolicy or danger" in giving the Secretary of the Treasury such power of set-off "where the counter claim is also a judgment, or where it is established by evidence so

In 1874, the Supreme Court in United States v. O'Grady, 89 U.S. 641, 647, 22 Wall. 641, 22 L.Ed. 772, considered the action of the Secretary of the Treasury in refusing to pay a judgment of the Court of Claims without deducting the amount that he determined was owed to the United States. The court stated:

"Judicial jurisdiction implies the power to hear and determine a cause and, inasmuch as the Constitution does not contemplate that there shall be more than one Supreme Court, it is quite clear that Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal or any other department of the Government. * * *

"Should it be suggested that the judgment in question was rendered in the Court of Claims, the answer to the suggestion is that the judgment of the Court of Claims, from which no appeal is taken, is just as conclusive under existing laws as the judgment of the Supreme Court, until it is set aside on a motion for new trial."

The Court of Claims in Bonnafon v. United States, 1878, 14 Ct.Cl. 484, 491, said: "The act of 1875, chapter 149, does not confer upon the Secretary of the Treasury the power to review the decrees and judgments of established courts of justice. Such a power would be in conflict with the fundamental principles of the whole judiciary system. It would confer upon the Secretary of the Treasury, an executive officer of the government, judicial power, contrary to article 3, section 1, of the Constitution, which provides that 'the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as Congress may from time to time ordain and establish.' "

In Richmond, F. & P. R. Co. v. McCarl, 61 App.D.C. 290, 62 F.2d 203, we discussed the Act of 1875 in relation to an order of the Interstate Commerce Commission under sec. 15a of the Interstate Commerce Act, 49 U.S.C.A. § 15a, withholding certain moneys due appellant for transporting mail for the Government of the United States. Speaking through Justice Groner, now Chief Justice, we said, at page 207: "The amount due therefor is not contested, and so we have a case in which the United States owe appellant money which the Comptroller General refuses to pay because of an unsettled and unliquidated claim of the United States against appellant. This may not be done. There is, however, a statute of the United States which provides a right and a remedy. It authorizes the United States to withhold payment in any case in which an allowed claim is presented to the Treasury for payment (and appellant's is such a claim), where the United States has a counterclaim, until suit can be instituted on the counterclaim and pressed to final judgment. Act March 3, 1875, c. 149, 18 Stat. 481, title 31 U.S.C. A. § 227. This statute, we think, was the chart which should have guided the Comptroller General in the procedure to be taken in this case, for otherwise we should have to concede to that officer the power of determining and settling an indebtedness of a citizen of the United States without trial, the examination of witnesses, or

conclusive that the opposite party is estopped from denying it. In such a case, he would be required to pass on nothing which is open to dispute. His function would be merely ministerial, consisting in nothing but the subtraction of one claim from the other and ascertaining the difference." In that case the claim was fiercely contested. He said "Not only are all the facts vehemently disputed, but the parties are as wide asunder as the poles on every question of law. It is proposed that this complicated entanglement shall be settled in the chamber of an executive officer, without a trial, without judge or jury, without examining witnesses, and without hearing counsel."

"No such jurisdiction is given to the Secretary * * * by any law, and if the Constitution is not a dead letter Congress cannot confer it. The fifth amendment declares that 'no person shall be deprived of his life, liberty, or property *without due process of law.*' This means, and has always been held to mean, that the right of a citizen to his property, as well as his life or liberty, could be taken away only upon an open, public, and fair trial before a judicial tribunal, according to the forms prescribed by the law of the land for the investigation of such subjects. If an executive officer can make an order that the widow and children of Reside shall be deprived of twenty-four thousand dollars without a trial, then the same officer may, with equal propriety, issue a warrant to hang them, since the Constitution puts life and property on the same footing."

the other safeguards of judge and jury which in our system of government are guaranteed." The Comptroller General contends here that in the Richmond Railroad case, supra, the matter of the administrative determination therein involved was not conclusive upon the courts. However, his contention in that case was the same as here. He stoutly maintained that the determination of the Interstate Commerce Commission was conclusive upon the courts; that its determination was under an act of Congress; that it had specific statutory direction to find and enter an order for the amount due and that this duty had been performed; and, that, as a result thereof, the indebtedness claimed by the government had been fixed by lawful authority,· and that it was of equal dignity with the indebtedness claimed by the railroad company which had been fixed for transportation services rendered to the United States. However, we held in that case that the Act of 1875, supra, required the indebtedness claimed for the government to be reduced to judgment before it could properly be set-off against a debt owing by the government which had been arrived at through administrative action.

The appellants further contend that the judgment is excluded from the operation of the Act of 1933, supra; that sec. 17 of the Act[7] governs the payment of insurance judgments and it does not provide expressly for the transmission of awards made by the Administrator to the Comptroller General for pre-audit or certification for payment, nor does it prohibit set-offs by the Administrator; and that the Administrator is authorized to pay such judgments as that involved herein without any action of the Comptroller General.

■ We think there is no substance in appellants' contentions, and that they mis-conceive the controlling statute in this case. Sec. 17 of Title I of the Act sets up a fund to pay insurance benefits provided for by Title III. Whenever there is a disagreement between the insured and Administrator concerning any insurance benefits which may be due under Title III, the Administrator is given the discretionary power by sec. 17 to determine the question, and, if his decision is favorable to the insured, to award and pay benefits from the fund. However, if the Administrator determines the question adversely to the insured, sec. 19 of Title I, 38 U.S.C.A. § 445 allows the insured to test the determination of the Administrator by proceeding in a district court of the United States. In the event the court decides in favor of the insured and enters judgment, the fund established by sec. 17 is available for the payment of the judgment. It will thus be seen that the discretion of the Administrator under Title III or sec. 17 of the Act is not conclusive, as sec. 19 provides for a judicial determination of the controversy.

■ Sec. 17 governs the payment of insurance judgments only to the extent recited above. There is nothing in this section which would indicate that an insurance judgment is to be treated in any manner differently than an ordinary judgment of any character which is obtained against the United States. We think it significant that Congress did not in express terms limit or exclude the payment of insurance judgments to the fund provided in sec. 17. The important thing is that sec. 17 does not authorize set-offs by the Administrator against such judgments, and so does not take them out of the operation of the Act of 1933, nor is there any provision in this section indicating a change of procedure.[8]

For years Congress has provided by statute for the payment of judgments

---

·7 "Sec. 17 [§ 443]. That all premiums paid on account of insurance converted under the provisions of Title III [Part III of this chapter] hereof shall be deposited and covered into the Treasury to the credit of the United States Government life insurance fund and shall be available for the payment of losses, dividends, refunds, and other benefits provided for under such insurance, including such liabilities as shall have been or shall hereafter be reduced to judgment in a district court of the United States or in' the Supreme Court of the District of Columbia. Payments from this fund shall be made upon and in accordance with awards by the director." 38 U.S.C.A. § 443.

8 The Act of June 10, 1921, c. 18, Tit. III, 42 Stat. 20, sec. 305, amending sec. 236 of the Revised Statutes; Tit. 31, sec. 71, U.S.C. 31 U.S.C.A. § 71, provides:

"All claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office."

against the United States and for the set-off against those judgments of any indebtedness due the United States by a judgment creditor. The Act of 1875, supra, provided that a claim of the United States against a judgment creditor, or against creditors who had a claim allowed by legal authority against the United States, must be reduced to judgment before it might be set-off against the judgment of a creditor. This was the law at the time of the enactment of sec. 17, and, as pointed out, was not in express terms changed by that section. However, in the Act of 1933, supra, passed after the enactment of sec. 17, Congress substantially reenacted the provisions of the Act of 1875 in respect of judgment claims. The act of 1933 expressly provided that when judgment has been obtained against the United States, a claim of the United States must be first reduced to judgment before it may be off-set against that judgment. It is therefore clear that the Act of 1933 governs the instant case.

The instant case is clearly illustrative of the wisdom of Congress in requiring alleged claims to be reduced to judgment under the acts of 1875 and 1933 before they can be used as set-offs to reduce or pay judgment debts against the United States. This veteran had service-connected disability, compensable from the date of his original discharge. The Administrator made his determination with reference to the second enlistment and the desertion therefrom, and awarded total disability benefits at the rate of $80 per month beginning the day next after the discharge from the second enlistment. On that day, April 20, 1926, the Administrator's brief admits he was held by the Administrator to be insane. The forfeiture of the veteran for prospective benefits under the Act was not imposed, in fact the Administrator affirmatively waived his right to declare a forfeiture and waived recovery of all payments made prior thereto, amounting to some $6,000 because of his determination that the "veteran could not distinguish between right and wrong and therefore should not be held accountable for his acts."

The Committee on Waivers and Forfeitures in November 1928 determined that on October 5, 1926, the veteran had perpetrated a fraud upon the government relating to his mental condition and that thereby he forfeited all payments between October 5, 1926 and November 30, 1928. The Administrator did not approve this finding until February 1932. In the first voucher forwarded the Administrator did not find that the overpayments should be offset against the judgment. The Administrator did not issue a stop payment notice until October 23, 1936 (after first voucher had been returned to him), in which "discontinuance of payments effective as of August 29, 1920—date of forfeiture—" was authorized. He then forwarded the second voucher to the Comptroller General advising that the compensation account was overpaid $7,091.61. It is contended by appellee that the statute of limitations had run by this time, and that the set-off was therefore barred.[9] If that be so, it would show with much force the arbitrariness of the retrospective forfeiture and the use of the overpayments to liquidate the judgment debt. Before the 1932 determination by the Administrator, the veteran in 1931 had again been adjudged to be of unsound mind in a Nebraska court, his mother appointed as guardian, and claim for benefits under the insurance policy made.

It was not pointed out in what manner the fraud alleged to be committed in October 1926 could affect the payments made for tuberculosis between date of discharge and April 20, 1926. It appears that the determination of overpayment for this period was based upon the claim that the veteran was not entitled to compensation in that period because of the second enlistment, the knowledge of which he had withheld. Sec. 212 of the Act, 38 U.S.C.A. § 422, is relied upon. It would seem that this section prohibits the payment of compensation for World War service while the veteran is in receipt of active service or retirement pay. There is no showing that the veteran received service pay; further, it is claimed by appellee he was never entitled to receive service pay because of his desertion under sections 132, 1373 and 1348 of the Army Regulations; and that, if he had received service pay it would have been for 15 or 16 days at the most.

Relative to the fraud on October 5, 1926, the record discloses that on that date the veteran was adjudged to be insane in a court proceeding in Minnesota and a guardian appointed. The court's action would seem to be confirmatory of the Administra-

---

[9] 28 U.S.C.A. § 791.

tion's finding in the preceding April. An unverified letter of an attorney is in the record. It appears that he represented the veteran in the lunacy proceeding in Minnesota; that he had given the veteran a note calling for payment of money; and that the veteran was endeavoring to collect it. The attorney wrote the veteran a letter and charged him with misleading the Administrator as to his mental condition. Because of this unsubstantiated charge the Administrator took his action, stopping compensation payments and forfeiting future benefits, and after intervention of the Comptroller, recovering these sums partially by setting them off against the judgment in the manner outlined above. This action was taken by the Administrator at a time when the veteran had again been adjudged to be insane by a court of competent jurisdiction.

We do not recite the foregoing record facts to show merit or demerit in the claim of the veteran under which these payments were made, or his right to defeat recovery of the alleged overpayment, nor do we pass judgment thereon. We have no doubt that, if fraud were perpetrated upon the government, there would be a duty to forfeit future benefits to the veteran if, in a proper case, the Administrator so determined, and the government would have the undoubted right to recover such overpayments in a proceeding in the courts as in other cases of fraud against the government. United States v. Mroch, 6 Cir., 88 F.2d 888. We have cited the foregoing record facts to demonstrate the wisdom and purpose of Congress in its passage of the Acts of 1875 and 1933 requiring a claim of the United States to be reduced to judgment in the courts before it may be set-off against a judgment obtained by its creditor, when such creditor does not assent to the set-off of the claim of the government.

 In the instant case the government had ample opportunity to reduce the claimed indebtedness to a judgment and then properly set it off against the judgment rendered in favor of the appellee. It could have done this in the original suit brought by appellee in the district court for determination of his claim under the policy of insurance. The Comptroller General in considering the first voucher transmitted to him could have caused legal proceedings to be immediately commenced to reduce the claim of the United States to judgment. Again, the government had an opportunity to determine the justness of its claim after the mandamus suit was brought by following the suggestion of the District Court. Apparently the distinguished jurist in the District Court, Judge Bailey, followed the suggested procedure in the Richmond Railroad case, supra, in expressing his willingness to entertain a motion to stay the proceedings pending the outcome of any suit by the United States to determine the question of set-off. Even now the Administrator requests that if we hold that their claim must be reduced to judgment before set-off, he be given another opportunity to have a court determination of this question. We think, however that they had three distinct opportunities to submit their claim in court. Each time they refused, and as the procedure suggested in the Richmond Railroad case, supra, was a matter of grace, we hardly feel that this course should be pursued in the instant case.

 The duty imposed by the Act of 1933, supra, upon the Comptroller was never exercised. At the present time there is a valid judgment of a federal court against the United States in favor of the appellee. Nothing now remains but the ministerial action of both the Administrator and the Comptroller General to liquidate this obligation. It is well settled that a purely ministerial duty may be commanded by mandamus.[10]

The judgment of the district court is affirmed.

[10] Kendall v. United States, 12 Pet. 524, 9 L.Ed. 1181; United States ex rel. Dunlap v. Black, 128 U.S. 40, 9 S.Ct. 12, 32 L.Ed. 354; Roberts v. United States ex rel. Valentine, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443; Parish v. MacVeagh, 214 U.S. 124, 29 S.Ct. 556, 53 L.Ed. 936; Smith v. Jackson, 246 U.S. 388, 38 S.Ct. 353, 62 L.Ed. 788; Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901; McCarl v. Wylly, 1 Cir., 5 F.2d 964; Smith v. United States, 4 Cir., 57 F.2d 998; United States ex rel. Lyons v. Hines, App.D.C., 103 F.2d 737, decided February 6, 1939.